# FOREMOST-McKESSON, INC. *v.* PROVIDENT SECURITIES CO.

No. 74–742.  Argued October 7, 1975—Decided January 13, 1976

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, Marshall, Blackmun, and Rehnquist, JJ., joined, and in all but Part IV–C of which White, J., joined. Stevens, J., took no part in the consideration or decision of the case.

*Morton Moskin* argued the cause for petitioner. With him on the briefs were *Thomas McGanney* and *Philip E. Diamond.*

*Noble K. Gregory* argued the cause for respondent. With him on the brief were *John B. Bates* and *Walter R. Allan.**

Mr. Justice Powell delivered the opinion of the Court.

This case presents an unresolved issue under § 16 (b)

---

**S. Hazard Gillespie* filed a brief for Allis-Chalmers Manufacturing Co. as *amicus curiae* urging reversal.

*Whitney North Seymour, John A. Guzzetta, Bernhardt K. Wruble,* and *Conrad K. Harper* filed a brief for Gulf & Western Industries, Inc., as *amicus curiae* urging affirmance.

234

of the Securities Exchange Act of 1934 (Act), 48
Stat. 896, 15 U. S. C. § 78p (b). That section of the
Act was designed to prevent a corporate director or officer
or "the beneficial owner of more than 10 per centum" of a
corporation [1] from profiteering through short-swing secu-
rities transactions on the basis of inside information. It
provides that a corporation may capture for itself the
profits realized on a purchase and sale, or sale and pur-
chase, of its securities within six months by a director, offi-
cer, or beneficial owner.[2] Section 16 (b)'s last sentence,

---

[1] The corporate "insiders" whose trading is regulated by § 16 (b)
are defined in § 16 (a) of the Act, 15 U. S. C. § 78p (a), as "[e]very
person who is directly or indirectly the beneficial owner of more
than 10 per centum of any class of any equity security (other than
an exempted security) which is registered pursuant to section 78*l* of
this title, or who is a director or an officer of the issuer of such
security."

[2] Section 16 (b), 15 U. S. C. § 78p (b), reads in full:

"For the purpose of preventing the unfair use of information
which may have been obtained by such beneficial owner, director,
or officer by reason of his relationship to the issuer, any profit
realized by him from any purchase and sale, or any sale and pur-
chase, of any equity security of such issuer (other than an exempted
security) within any period of less than six months, unless such
security was acquired in good faith in connection with a debt pre-
viously contracted, shall inure to and be recoverable by the issuer,
irrespective of any intention on the part of such beneficial owner,
director, or officer in entering into such transaction of holding the
security purchased or of not repurchasing the security sold for a
period exceeding six months. Suit to recover such profit may be
instituted at law or in equity in any court of competent jurisdiction
by the issuer, or by the owner of any security of the issuer in the
name and in behalf of the issuer if the issuer shall fail or refuse to
bring such suit within sixty days after request or shall fail diligently
to prosecute the same thereafter; but no such suit shall be brought
more than two years after the date such profit was realized. This
subsection shall not be construed to cover any transaction where such
beneficial owner was not such both at the time of the purchase and
sale, or the sale and purchase, of the security involved, or any trans-

however, provides that it "shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved . . . ." The question presented here is whether a person purchasing securities that put his holdings above the 10% level is a beneficial owner "at the time of the purchase" so that he must account for profits realized on a sale of those securities within six months. The United States Court of Appeals for the Ninth Circuit answered this question in the negative. 506 F. 2d 601 (1974). We affirm.

## I

Respondent, Provident Securities Co., was a personal holding company. In 1968 Provident decided tentatively to liquidate and dissolve, and it engaged an agent to find a purchaser for its assets. Petitioner, Foremost-McKesson, Inc., emerged as a potential purchaser, but extensive negotiations were required to resolve a disagreement over the nature of the consideration Foremost would pay. Provident wanted cash in order to facilitate its dissolution, while Foremost wanted to pay with its own securities.

Eventually a compromise was reached, and Provident and Foremost executed a purchase agreement embodying their deal on September 25, 1969. The agreement provided that Foremost would buy two-thirds of Provident's assets for $4.25 million in cash and $49.75 million in Foremost convertible subordinated debentures.[3] The agreement further provided that Foremost would register under the Securities Act of 1933 $25 million in

---

action or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

[3] The debentures were issued expressly to acquire Provident's assets, and all of them were used for that purpose.

principal amount of the debentures and would participate in an underwriting agreement by which those debentures would be sold to the public. At the closing on October 15, 1969, Foremost delivered to Provident the cash and a $40 million debenture which was subsequently exchanged for two debentures in the principal amounts of $25 million and $15 million. Foremost also delivered a $2.5 million debenture to an escrow agent on the closing date. On October 20 Foremost delivered to Provident a $7.25 million debenture representing the balance of the purchase price. These debentures were immediately convertible into more than 10% of Foremost's outstanding common stock.

On October 21 Provident, Foremost, and a group of underwriters executed an underwriting agreement to be closed on October 28. The agreement provided for sale to the underwriters of the $25 million debenture. On October 24 Provident distributed the $15 million and $7.25 million debentures to its stockholders, reducing the amount of Foremost common into which the company's holdings were convertible to less than 10%. On October 28 the closing under the underwriting agreement was accomplished.[4] Provident thereafter distributed the cash proceeds of the debenture sale to its stockholders and dissolved.

Provident's holdings in Foremost debentures as of October 20 were large enough to make it a beneficial owner of Foremost within the meaning of § 16.[5] Having

[4] The underwriters delivered $25,366,666.66 in cash to Provident. That amount represented a purchase price of $101\frac{1}{4}\%$ of the principal amount of the debenture ($25,312,500) plus interest accrued from October 15 to the date of closing ($54,166.66). The amount of profit realized by Provident has never been established.

[5] A beneficial owner is one who owns more than 10% of an "equity security" registered pursuant to § 12 of the Act, 15 U. S. C. § 78l. See n. 1, supra. The owner of debentures convertible into more than

acquired and disposed of these securities within six months, Provident faced the prospect of a suit by Foremost to recover any profits realized on the sale of the debenture to the underwriters. Provident therefore sued for a declaration that it was not liable to Foremost under § 16 (b). The District Court granted summary judgment for Provident, and the Court of Appeals affirmed.

Provident's principal argument below for nonliability was based on *Kern County Land Co.* v. *Occidental Corp.*, 411 U. S. 582 (1973). There we held that an "unorthodox transaction" in securities that did not present the possibility of speculative abuse of inside information was not a "sale" within the meaning of § 16 (b). Provident contended that its reluctant acceptance of Foremost debentures in exchange for its assets was an "unorthodox transaction" not presenting the possibility of speculative abuse and therefore was not a "purchase" within the meaning of § 16 (b). Although the District Court's pre-*Kern County* opinion had adopted this type of analysis, 331 F. Supp. 787 (ND Cal. 1971), the Court of Appeals rejected it, reasoning that Provident's acquisition of the debentures was not "unorthodox" and that the circumstances did not preclude the possibility of speculative abuse. 506 F. 2d, at 604–605.

The Court of Appeals then considered two theories of nonliability based on § 16 (b)'s exemptive provision: "This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale

---

10% of a corporation's registered common stock is a beneficial owner within the meaning of the Act. §§ 3 (a) (10), (11) of the Act, 15 U. S. C. §§ 78c (a) (10), (11); Rule 16a–2 (b), 17 CFR § 240.16a–2 (b) (1975). Foremost's common stock was registered; thus Provident's holdings made it a beneficial owner.

and purchase . . . ." The first was Provident's argument that it was not a beneficial owner "at the time of . . . sale." After the October 24 distribution of some debentures to stockholders, the debentures held by Provident were convertible into less than 10% of Foremost's outstanding common stock. Provident contended that its sale to the underwriters did not occur until the underwriting agreement was closed on October 28. If this were the case, the sale would not have been covered by § 16 (b), since Provident would not have been a beneficial owner "at the time of . . . sale." [6] The Court of Appeals rejected this argument because it found that the sale occurred on October 21 upon execution of the underwriting agreement.[7]

---

[6] This contention was based on *Reliance Electric Co.* v. *Emerson Electric Co.*, 404 U. S. 418 (1972). There the Court held that a sale made after a former beneficial owner had already reduced its holdings below 10% was exempted from § 16 (b) by the phrase "at the time of . . . sale" in the exemptive provision. See n. 25, *infra*.

[7] Section 3 (a) (14) of the Act, 15 U. S. C. § 78c (a) (14), defines "sale" and "sell" to include "any contract to sell or otherwise dispose of." But Provident argued that the October 28 closing date was the day of sale because contractual conditions prevented the contract from becoming binding until closing. The underwriting agreement provided in paragraph 7:

"7. Termination of Agreement: This agreement may be terminated, prior to the time the Registration Statement becomes effective, by you or by any group of Underwriters which has agreed hereunder to purchase in the aggregate at least 50% of the Debentures, if, in your judgment or in the judgment of any such group of Underwriters, there shall have occurred a material unfavorable change in political, financial or economic conditions generally." App. A134.

And in paragraph 5, the agreement provided: "The several obligations of the Underwriters hereunder are subject to the following conditions:

"(h) That, between the time of execution of this agreement and the time of purchase, there shall occur no material and unfavorable

The Court of Appeals then turned to the theory of nonliability based on the exemptive provision that we consider here.[8]  It held that in a purchase-sale sequence the phrase "at the time of the purchase," "must be construed to mean prior to the time when the decision to purchase is made." 506 F. 2d, at 614.  Thus, although Provident became a beneficial owner of Foremost by acquiring the debentures, it was not a beneficial owner "at the time of the purchase."  Accordingly, the exemptive provision prevented any § 16 (b) liability on Provident's part.

## II

The meaning of the exemptive provision has been disputed since § 16 (b) was first enacted.  The discussion has focused on the application of the provision to

change, financial or otherwise (other than as referred to in the Registration Statement and the Prospectus), in the condition of the Company and its consolidated subsidiaries as a whole; and the Company will, at the time of purchase, deliver to you a certificate of two of its executive officers to the foregoing effect." App. A134.

The Court of Appeals agreed that conditions to performance might prevent a contract from being a "sale" prior to closing.  But it ruled that all significant conditions here were satisfied when the registration statement required by paragraph 7 became effective on October 21, the day the underwriting agreement was executed.  The court also found that after October 21, Provident was no longer subject to the risk of a decline in the market for Foremost's stock. 506 F. 2d, at 607.  For reasons not apparent from its opinion, the court did not address the possibility that paragraph 5 (h) left Provident subject to market risks.  See n. 8, infra.

[8] Our holding on this issue disposes of this case by precluding any liability on Provident's part.  We therefore do not consider whether the Court of Appeals properly rejected Provident's arguments based on *Kern County Land Co.* v. *Occidental Corp.*, 411 U. S. 582 (1973), and on the sale's not having occurred until October 28.

a purchase-sale sequence, the principal disagreement being whether "at the time of the purchase" means "before the purchase" or "immediately after the purchase." [9] The difference in construction is determinative of a beneficial owner's liability in cases such as Provident's where such owner sells within six months of purchase the securities the acquisition of which made him a beneficial owner. The commentators divided immediately over which construction Congress intended,[10] and they remain divided.[11] The Courts of Appeals also are in disagreement over the issue.

The question of what Congress intended to accomplish by the exemptive provision in a purchase-sale sequence came to a Court of Appeals for the first time in *Stella* v. *Graham-Paige Motors Corp.*, 232 F. 2d 299 (CA2), cert. denied, 352 U. S. 831 (1956). There the Court of Appeals for the Second Circuit without discussion, but over a dissent, affirmed the District Court's

---

[9] The alternative construction to "before the purchase" is sometimes denominated "simultaneously with the purchase," as it was by the Court of Appeals. 506 F. 2d, at 608.

[10] Compare C. Meyer, The Securities Exchange Act of 1934, p. 112 (1934) (adopting a "before" construction), with Seligman, Problems Under the Securities Exchange Act, 21 Va. L. Rev. 1, 19–20 (1934) (adopting an "immediately after" construction).

[11] Compare, *e. g.*, Munter, Section 16 (b) of the Securities Exchange Act of 1934: An Alternative to "Burning Down the Barn in Order to Kill the Rats," 52 Cornell L. Q. 69, 74–75 (1966); Note, Insider Liability for Short-Swing Profits: The Substance and Function of the Pragmatic Approach, 72 Mich. L. Rev. 592, 616–619 (1974); Comment, 9 Stan. L. Rev. 582 (1957) (adopting a "before" construction), with, *e. g.*, 2 L. Loss, Securities Regulation 1060 (2d ed. 1961) (favoring an "immediately after" construction). The weight of the commentary appears to be with the "before the purchase" construction. The ALI Federal Securities Code (Tentative Draft No. 2, 1973), § 1413 (d) and Comment (6), considers the "immediately after the purchase" construction "questionable" on the statutory language and proposes an amendment to codify the result.

adoption of the "immediately after the purchase" construction. That court had been impelled to this construction at least in part by concern over what the phrase "at the time of . . . purchase" means in a sale-repurchase sequence, reasoning:

> "If the ['before the purchase'] construction urged by [Graham-Paige] is placed upon the exemption provision, it would be possible for a person to purchase a large block of stock, sell it out until his ownership was reduced to less than 10%, and then repeat the process, ad infinitum." 104 F. Supp. 957, 959 (SDNY 1952).

The District Court may have thought that "before the purchase" seemed an unlikely construction of the exemptive provision in a sale-repurchase sequence, so it could not be the proper construction in a purchase-sale sequence.[12] The *Stella* construction of the exemptive provision has been adhered to in the Second Circuit, *Newmark* v. *RKO General, Inc.*, 425 F. 2d 348, 355–356, cert. denied, 400 U. S. 854 (1970);[13] *Perine* v.

---

[12] *Stella* was decided before § 10 (b) of the Act, 15 U. S. C. § 78j (b), as implemented by Rule 10b-5, 17 CFR § 240.10b-5 (1975), developed fully as a private remedy for actual abuses of inside information. See 6 L. Loss, *supra*, n. 11, at 3559. The sale-repurchase abuse that worried the *Stella* court would now invite § 10 (b) liability, see n. 29, *infra*, as well as possible liability under § 16 (b).

[13] To rationalize its view as applied to the purchase-sale sequence, the court in *Newmark* wrote:

"[T]he presumed access to [inside] information resulting from [the] purchase [that makes one a beneficial owner] provides him with an opportunity, not available to the investing public, to sell his shares at the moment most advantageous to him. Thus, a purchase of shares which makes the buyer an insider creates an opportunity for the type of speculative abuse the statute was enacted to prevent." 425 F. 2d, at 356.

*William Norton & Co.,* 509 F. 2d 114, 118 (1974), and adopted by the Court of Appeals for the Eighth Circuit. *Emerson Electric Co.* v. *Reliance Electric Co.,* 434 F. 2d 918, 923–924 (1970), aff'd on other grounds, 404 U. S. 418 (1972).[14] But in none of the foregoing cases did the court examine critically the legislative history of § 16 (b).

The Court of Appeals considered this case against the background, sketched above, of ambiguity in the pertinent statutory language, continued disagreement among the commentators, and a perceived absence in the relatively few decided cases of a full consideration of the purpose and legislative history of § 16 (b). The court found unpersuasive the rationales offered in *Stella* and its progeny for the "immediately after the purchase" construction. It noted that construing the provision to require that beneficial-ownership status exist before the purchase in a purchase-sale sequence would not foreclose an "immediately after the purchase" construction in a sale-repurchase sequence.[15] 506 F. 2d, at 614–615. More significantly, the Court of Appeals challenged directly the premise of the earlier cases that a "before the purchase" construction in a purchase-sale sequence would allow abuses Congress intended to abate. The court reasoned that in § 16 (b) Congress intended to reach only those beneficial owners who both bought and sold on the basis of inside information, which was pre-

---

[14] When this Court decided *Reliance Electric Co.* v. *Emerson Electric Co.,* 404 U. S. 418 (1972), the question presented here was no longer in the case. See n. 25, *infra.*

[15] The view of the Court of Appeals that "at the time of" may mean different things in different contexts is not unique. See *Allis-Chalmers Mfg. Co.* v. *Gulf & Western Industries,* 527 F. 2d 335 (CA7 1975), cert. pending, No. 75–580. We express no opinion here on this view.

sumptively available to them only after they became statutory "insiders." 506 F. 2d, at 608–614.[16]

## III

### A

The general purpose of Congress in enacting § 16 (b) is well known. See *Kern County Land Co.*, 411 U. S., at 591–592; *Reliance Electric Co.*, 404 U. S., at 422, and the authorities cited therein. Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors. In § 16 (b) Congress sought to "curb the evils of insider trading [by] . . . taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Electric Co.*, *supra*, at 422. It accomplished this by defining directors, officers, and beneficial owners as those presumed to have access to inside information [17] and enacting a flat rule

---

[16] Shortly before this case was argued the Court of Appeals for the Seventh Circuit reached the same conclusion on somewhat different analysis. *Allis-Chalmers Mfg. Co.*, *supra*, at 347–349. The court apparently would have reached its result even in the absence of the exemptive provision, reasoning that § 16 (b) covers no transactions by any § 16 (b) insiders who were not insiders before their initial transaction. *Id.*, at 347–348. Since we rely on the exemptive provision, we intimate no view on the proper analysis of a case where a director or officer makes an initial transaction before obtaining insider status. See, *e. g.*, *Adler* v. *Klawans*, 267 F. 2d 840 (CA2 1959). Nor do we have occasion here to assess the approach taken by the Court of Appeals for the Seventh Circuit to the exemptive provision. 527 F. 2d, at 348–349, and n. 13. See n. 25, *infra*.

[17] The purpose of § 16 (b) is stated explicitly to be "preventing the unfair use of information which may have been obtained by

that a corporation could recover the profits these insiders made on a pair of security transactions within six months.[18]

Foremost points to this purpose, and invokes the observation in *Reliance Electric Co.* that "where alternative constructions of the terms of § 16 (b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." 404 U. S., at 424 (footnote omitted). From these premises Foremost argues that the Court of Appeals' construction of the exemptive provision must be rejected [19] because it makes § 16 (b) inapplicable to some possible abuses of inside information that the statute would reach under the *Stella* construction.[20] We find this approach unsatisfactory in its focus on situations that § 16 (b) may not reach rather than on the language and purpose of the exemptive provision itself. Foremost's approach also invites an imposition of § 16 (b)'s liability without fault that is not consistent with the premises upon which Congress enacted the section.

---

such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U. S. C. § 78p (b).

[18] Section 16 (b) states that any short-swing profits "shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months." 15 U. S. C. § 78p (b).

[19] In lieu of the Court of Appeals' construction, Foremost offers a construction whereby any purchases prior to the purchase making one a beneficial owner are exempted from the operation of § 16 (b). See 2 Loss, *supra*, n. 11, at 1060.

[20] *Newmark* describes a possible abuse of inside information covered only under the *Stella* construction. See n. 13, *supra*.

## B

The exemptive provision, which applies only to beneficial owners and not to other statutory insiders, must have been included in § 16 (b) for a purpose. Although the extensive legislative history of the Act is bereft of any explicit explanation of Congress' intent, see *Reliance Electric Co., supra,* at 424, the evolution of § 16 (b) from its initial proposal through passage does shed significant light on the purpose of the exemptive provision.

The original version of what would develop into the Act was S. 2693, 73d Cong., 2d Sess. (1934). It provided in § 15 (b):

"It shall be unlawful for any director, officer, or owner of securities, owning as of record and/or beneficially more than 5 per centum of any class of stock of any issuer, any security of which is registered on a national securities exchange—

"(1) To purchase any such registered security with the intention or expectation of selling the same security within six months; and any profit made by such person on any transaction in such a registered security extending over a period of less than six months shall inure to and be recoverable by the issuer, irrespective of any intention or expectation on his part in entering into such transaction of holding the security purchased for a period exceeding six months."

In the next version of the legislation, H. R. 8720, 73d Cong., 2d Sess. (1934), § 15 (b) read almost identically to § 16 (b) as it was eventually enacted: [21]

"Any profit realized by such beneficial owner,

[21] As can be seen by comparing H. R. 8720's version of § 15 (b) with § 16 (b), *supra,* n. 2, the differences are relatively minor. Formally, the statement of purpose was moved to the front of the stat-

director, or officer from any purchase and sale or sale and purchase of any such registered equity security within a period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale or sale and purchase of the security involved, nor any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer."

Thomas G. Corcoran, a spokesman for S. 2693's drafters, explained § 15 (b) as forbidding an insider "to carry on any short-term specu[la]tions in the stock. He cannot, with his inside information get in and out of stock within six months." Hearings on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 133 (1934). The Court of Appeals concluded that § 15 (b) of S. 2693

ute and various grammatical changes were made. A significant substantive change not apparent from the faces of the two sections is that § 16 (b) beneficial owners are those owning more than 10% of a registered security, while H. R. 8720 retained S. 2693's 5% requirement. Compare § 16 (a) of the Act, 15 U. S. C. § 78p (a), with H. R. 8720, 73d Cong., 2d Sess., § 15 (a) (1934).

would have applied only to a beneficial owner who had that status before a purchase-sale sequence was initiated, 506 F. 2d, at 609, and we agree. Foremost appears not to contest this point. Brief for Petitioner 29. The question thus becomes whether H. R. 8720's change in the language imposing liability and its addition of the exemptive provision were intended to change S. 2693's result in a purchase-sale sequence by a beneficial owner. We think the legislative history shows no such intent.

S. 2693 and its House counterpart, H. R. 7852, 73d Cong., 2d Sess. (1934), met substantial criticism on a number of scores, including various provisions of § 15. See Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., pt. 15 (1934); Hearings on H. R. 7852 and H. R. 8720, *supra,* at 1–623.[22] S. 2693 was recast into H. R. 8720 to take account of the criticisms that the bill's drafters thought valid. Hearings on H. R. 7852 and H. R. 8720, *supra,* at 625, 674. The primary substantive criticism directed at § 15 (b) of S. 2693 was that it did not prevent the use of inside information to reap a short-term profit in a sale-repurchase situation. See Hearings on Stock Exchange Practices, *supra,* at 6557–6558. Criticism was also directed at making liability for short-term profits turn on ownership "as of record and/or beneficially." See *id.,* at 6914. H. R. 8720 remedied these perceived shortcomings by providing in § 15 (b): "Any profit realized by such beneficial

---

[22] Corcoran termed § 15 "one of the most important provisions in [S. 2693]." Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., 6555 (1934). But most of the proposed legislation was directed at regulation of the stock exchanges themselves and certain trading practices that were considered undesirable regardless of who performed them. See *id.,* at 6465–6466. Most of the hearings, therefore, dealt with other problems.

owner, director, or officer from any purchase and sale or sale and purchase . . . shall inure to and be recoverable by the issuer." [23]   The term "such beneficial owner" was defined in § 15 (a) to mean one "who is directly or indirectly the beneficial owner of more than 5 per centum of any class" of a registered security.

The structure of the clause imposing liability in the revised § 15 (b) did not unambiguously retain S. 2693's requirement that beneficial ownership precede a purchase-sale sequence.   But we cannot assume easily that Congress intended to eliminate the requirement in the revised bill.   The legislative history reveals that the requirement was made clear in the hearings, yet no complaint was made about it.

The testimony on S. 2693 demonstrates that the drafters were emphatic about the requirement.   In explaining the bill Corcoran pointed out a technical flaw in S. 2693's language: "It shall be unlawful for any director, officer, or owner of securities, owning as of record and/or beneficially more than 5 per centum of any class of stock . . . ."   It was possible to construe the phrase "owning . . . 5 per centum" to apply to directors ·and officers as well as to mere stockholders, so that trading by directors and officers would not be subject to § 15 (b) if their previous holdings did not exceed 5%.   But Corcoran made clear that the requirement of pre-existing

---

[23] The other major substantive change effected in § 15 (b) by H. R. 8720 was the elimination of the potential criminal liability. The criminal liability aspect of S. 2693's version of § 15 (b) received almost no attention in hearings.  But cf. Hearings on Stock Exchange Practices, *supra*, at 6966.  It may have been thought, however, that a criminal case could never be made out.  The difficulties of proving the mental elements on which criminal liability turned had already led the drafters to eliminate those questions of fact in civil suits to recover profits.  See n. 26, *infra*.

ownership of the specified percentage applied only to beneficial owners.

> "Mr. CORCORAN. . . . The bill is not very well drawn there. It ought to read to cover every director, every officer, and every stockholder who owns more than 5 percent of the stock. That is the way it was intended to read.
>
> .        .        .        .        .
>
> "Mr. MAPES. It ought to read 'and/or beneficially more than 5 percent' followed by 'is a director, or officer.'
>
> "Mr. CORCORAN. It is badly drawn. We slipped on that. It ought to read 'every director and every officer' and then 'every big stockholder.' " Hearings on H. R. 7852 and H. R. 8720, *supra,* at 133.

See Hearings on Stock Exchange Practices, *supra,* at 6555.

The legislative record thus reveals that the drafters focused directly on the fact that S. 2693 covered a short-term purchase-sale sequence by a beneficial owner only if his status existed before the purchase, and no concern was expressed about the wisdom of this requirement. But the explicit requirement was omitted from the operative language of the section when it was restructured to cover sale-repurchase sequences. In the same draft, however, the exemptive provision was added to the section. On this record we are persuaded that the exemptive provision was intended to preserve the requirement of beneficial ownership before the purchase. Later discussions of the present § 16 (b) in the hearings are consistent with this interpretation.[24] We hold that,

---

[24] "Mr. PECORA. The theory was that the ownership of 5 percent of the stock would practically constitute him an insider, and by virtue of that position he could acquire confidential information which

in a purchase-sale sequence, a beneficial owner must account for profits only if he was a beneficial owner "before the purchase." [25]

---

he might use for his own enrichment by trading in the open market, against the interests of the general body of the stockholders. That is the main purpose sought to be served." Hearings on Stock Exchange Practices, *supra*, at 7741.

Ferdinand Pecora was counsel to the subcommittee of the Senate Committee on Banking and Currency that conducted extensive hearings on stock exchange operations prior to the enactment of the Act. He was also one of the draftsmen of S. 2693. Hearings on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 83 (1934).

[25] In *Reliance Electric Co. v. Emerson Electric Co.*, 404 U. S. 418 (1972), the Court also had occasion to consider the application of the exemptive provision in a purchase-sale sequence. There Emerson acquired 13.2% of the shares of Reliance's predecessor pursuant to a tender offer and within six months disposed of its holdings in two sales of 3.24% and 9.96%. The Court of Appeals for the Eighth Circuit held that the purchase, by which Emerson became a beneficial owner, was covered by § 16 (b). But it ruled that Emerson was liable for the profits on only its first sale, because "at the time of . . . sale" of the 9.96%, it was not a beneficial owner.

The Court granted certiorari on Reliance's petition to review this construction of "at the time of . . . sale," and affirmed. The construction of "at the time of the purchase," however, was not before the Court. 404 U. S., at 420–422. Emerson thus remained liable for the 3.24% sale, although it would have had no liability under our holding today. The Court of Appeals for the Seventh Circuit has noted correctly that the construction of "at the time of . . . sale" in *Reliance Electric Co.* is superfluous in light of the construction of "at the time of the purchase" adopted by the Court of Appeals for the Ninth Circuit, which we affirm here. See *Allis-Chalmers Mfg. Co.*, 527 F. 2d, at 348 n. 12. But the procedural posture of *Reliance Electric Co.* prevented a full consideration of the meaning of the exemptive provision. See *ibid.* We express no opinion on the interpretation of the provision by which the Court of Appeals for the Seventh Circuit sought to avoid the apparent superfluity of the "at the time of . . . sale" language. *Id.*, at 348; *supra*, n. 16.

## IV

Additional considerations support our reading of the legislative history.

## A

Section 16 (b) imposes a strict prophylactic rule with respect to insider, short-swing trading. In *Kern County Land Co.*, 411 U. S., at 595, we noted:

> "The statute requires the [statutorily defined] inside, short-swing trader to disgorge all profits realized on all 'purchases' and 'sales' within the specified time period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information."

In short, this statute imposes liability without fault within its narrowly drawn limits.[26]

As noted earlier, Foremost recognizes the ambiguity of the exemptive provision, but argues that where "alter-

---

[26] "Mr. CORCORAN. . . . You hold the director, irrespective of any intention or expectation to sell the security within 6 months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb, because you cannot undertake the burden of having to prove that the director intended, at the time he bought, to get out on a short swing.

"Senator GORE. You infer the intent from the fact.

"Mr. CORCORAN. From the fact.

"Senator KEAN. Suppose he got stuck in something else, and he had to sell?

"Senator BARKLEY. All he would get would be what he put into it. He would get his original investment.

"Mr. CORCORAN. He would get his money out, but the profit goes to the corporation.

"Senator KEAN. Suppose he had to sell.

"Mr. CORCORAN. Let him get out what he put in, but give the corporation the profit." Hearings on Stock Exchange Practices, *supra*, n. 22, at 6556–6557.

native constructions" of § 16 (b)'s terms are available, we should choose the construction that best serves the statute's purposes. Foremost relies on statements generally to this effect in *Kern County Land Co., supra,* at 595, and *Reliance Electric Co.,* 404 U. S., at 424. In neither of those cases, however, did the Court adopt the construction that would have imposed liability, thus recognizing that serving the congressional purpose does not require resolving every ambiguity in favor of liability under § 16 (b). We reiterate that nothing suggests that the construction urged by Foremost would serve better to further congressional purposes. Indeed, the legislative history of § 16 (b) indicates that by adding the exemptive provision Congress deliberately expressed a contrary choice. But even if the legislative record were more ambiguous, we would hesitate to adopt Foremost's construction. It is inappropriate to reach the harsh result of imposing § 16 (b)'s liability without fault on the basis of unclear language. If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference.

It is not irrelevant that Congress itself limited carefully the liability imposed by § 16 (b). See *Reliance Electric Co., supra,* at 422–425. Even an insider may trade freely without incurring the statutory liability if, for example, he spaces his transactions at intervals greater than six months. When Congress has so recognized the need to limit carefully the "arbitrary and sweeping coverage" of § 16 (b), *Bershad* v. *McDonough,* 428 F. 2d 693, 696 (CA7 1970), cert. denied, 400 U. S. 992 (1971), courts should not be quick to determine that, despite an acknowledged ambiguity, Congress intended the section to cover a particular transaction.

## B

Our construction of § 16 (b) also is supported by the distinction Congress recognized between short-term trading by mere stockholders and such trading by directors and officers. The legislative discourse revealed that Congress thought that all short-swing trading by directors and officers was vulnerable to abuse because of their intimate involvement in corporate affairs. But trading by mere stockholders was viewed as being subject to abuse only when the size of their holdings afforded the potential for access to corporate information.[27] These

---

[27] This distinction is especially evident in the following exchange, directed to the reporting requirements imposed by § 15 (a) of S. 2693 on beneficial owners:

"Senator KEAN. Suppose a man is not a director at all and does not want to be a director, and he happens to own 5 percent or buy 5 percent. Do you think you are going to get him to file with the exchange all the time just the number of shares he has?

"Mr. CORCORAN. I think so, sir.

. . . . .

"Senator KEAN. I think it is all right to apply it to a director or officer, but I think to require the ordinary investor——

"Mr. CORCORAN. Five percent is a lot in a modern corporation. Many corporations are controlled by 5 percent or 10 percent.

"Senator KEAN. They may own it or they may sell it. This applies to all corporations, and you are getting down to the point where you are interfering with the individual a good deal there. I agree with you with respect to the officers and directors.

"Mr. CORCORAN. A stockholder owning 5 percent is as much an insider as an officer or director. Whether he is a titular director or not, he normally is, as a practical matter of fact, a director.

"Senator KEAN. He might not be." Hearings on Stock Exchange Practices, *supra*, n. 22, at 6556.

The distinction also is reflected in the discussion of the technical flaw in S. 2693. See *id.*, at 6555; Hearings on H. R. 7852 and H. R. 8720, *supra*, n. 24, at 133. See also Hearings on Stock Exchange Practices, *supra*, n. 22, at 7741–7743.

different perceptions simply reflect the realities of corporate life.

It would not be consistent with this perceived distinction to impose liability on the basis of a purchase made when the percentage of stock ownership requisite to insider status had not been acquired. To be sure, the possibility does exist that one who becomes a beneficial owner by a purchase will sell on the basis of information attained by virtue of his newly acquired holdings. But the purchase itself was not one posing dangers that Congress considered intolerable, since it was made when the purchaser owned no shares or less than the percentage deemed necessary to make one an insider.[28]  Such a stockholder is more analogous to the stockholder who never owns more than 10% and thereby is excluded entirely from the operation of § 16 (b), than to a director or officer whose every purchase and sale is covered by the statute. While this reasoning might not compel our construction of the exemptive provision, it explains why Congress may have seen fit to draw the line it did. Cf. *Adler* v. *Klawans,* 267 F. 2d 840, 845 (CA2 1959).

---

[28] Thus, according to the presumption of the statute, the purchaser did not have access to inside information in making the purchase. It should be noted further that as a matter of practicalities the crucial point in the acquisition of securities is not the technical "purchase," but rather the decision to make an acquisition. In the case of an acquisition of a large block of a corporation's stock, that decision may precede the "purchase" by a considerable period of time. A prudent investor will want to investigate all available information on the corporation. Such an investor also may need time to finance the purchase, and may wish to effectuate purchases without influencing the market price. These realities emphasize that the acquisition decision by a beneficial owner normally will occur well in advance of the event that is presumed to afford access to inside information.

## C

Section 16 (b)'s scope, of course, is not affected by whether alternative sanctions might inhibit the abuse of inside information. Congress, however, has left some problems of the abuse of inside information to other remedies. These sanctions alleviate concern that ordinary investors are unprotected against actual abuses of inside information in transactions not covered by § 16 (b). For example, Congress has passed general antifraud statutes that proscribe fraudulent practices by insiders. See Securities Act of 1933, § 17 (a), 48 Stat. 84, 15 U. S. C. § 77q (a); Securities Exchange Act of 1934, § 10 (b), 15 U. S. C. § 78j (b); 3 Loss, *supra,* n. 11, at 1423–1429, 1442–1445. Today an investor who can show harm from the misuse of material inside information may have recourse, in particular, to § 10 (b) and Rule 10b–5, 17 CFR § 240.10b–5 (1975).[29] It also was thought that § 16 (a)'s publicity requirement [30]

---

[29] Rule 10b–5 has been held to embrace evils that Foremost urges its construction of § 16 (b) is necessary to prevent. The Rule has been applied to trading by one who acquired inside information in the course of negotiations with a corporation, such as the negotiations for Provident's purchase of the Foremost debentures. *Van Alstyne, Noel & Co.,* 43 S. E. C. 1080 (1969); 3 Loss, *supra,* n. 11, at 1451–1452. And a stockholder trading on information not generally known has been held subject to the sanctions of the Rule. *Shapiro* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F. 2d 228 (CA2 1974); *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d 833 (CA2 1968), cert. denied *sub nom. Coates* v. *SEC,* 394 U. S. 976 (1969). The liability of insiders who improperly "tip" others, *SEC* v. *Texas Gulf Sulphur Co.,* 446 F. 2d 1301 (CA2), cert. denied, 404 U. S. 1005 (1971), may reduce the threat that beneficial owners not themselves represented on the board of directors will be able to acquire inside information from officers and directors. We cite these cases for illustrative purposes without necessarily implying approval.

[30] Section 16 (a), 15 U. S. C. § 78p (a), provides:

"Every person who is directly or indirectly the beneficial

would afford indirect protection against some potential misuses of inside information.[31]   See Hearings on H. R. 7852 and H. R. 8720, *supra,* at 134–135; H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13 (to accompany H. R. 9323, 73d Cong., 2d Sess., passed by the House, May 4, 1934, without the present § 16 (b)).

---

owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security, shall file, at the time of the registration of such security on a national securities exchange or by the effective date of a registration statement filed pursuant to section 78*l* (g) of this title, or within ten days after he becomes such beneficial owner, director, or officer, a statement with the Commission (and, if such security is registered on a national securities exchange, also with the exchange) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been a change in such ownership during such month, shall file with the Commission (and if such security is registered on a national securities exchange, shall also file with the exchange), a statement indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month."

[31] The drafters clearly thought that § 16 (a) would help deter abuses not covered by § 16 (b).

"[Mr. Corcoran.]   [S]ection 15 (a), requires every director, officer, or principal holder of any securities listed on an exchange to file with the exchange and with the commission a statement of how many shares he owns and to file that statement at the end of each month to show whether there has been any change in his position during the month.   That is to prevent the insider from taking advantage of information to sell or buy shares ahead of the release of information to the public about the company."

These remarks were addressed to S. 2693.   Hearings on H. R. 7852 and H. R. 8720, *supra,* n. 24, at 132.

## V

We must still consider briefly Foremost's contention that the "before the purchase" construction renders other enactments of Congress unnecessary and conflicts with the interpretation of § 16 (b) by the Securities and Exchange Commission.

Foremost and *amicus* Allis-Chalmers Manufacturing Co. point to §§ 16 (d) and (e) of the Act, 15 U. S. C. §§ 78p (d) and (e), as congressional actions that would not have been necessary unless one selling the securities the acquisition of which made him a beneficial owner is liable under § 16 (b). Section 16 (d), in part, exempts from § 16 (b) certain transactions by a securities "dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market." [32] Section 16 (e) provides an exemption for certain "foreign or domestic arbitrage transactions." [33] They argue similarly that the SEC's

---

[32] Section 16 (d), 15 U. S. C. § 78p (d), provides:

"The provisions of subsection (b) of this section shall not apply to any purchase and sale, or sale and purchase, and the provisions of subsection (c) of this section shall not apply to any sale, of an equity security not then or theretofore held by him in an investment account, by a dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market (otherwise than on a national securities exchange or an exchange exempted from registration under section 78e of this title) for such security. The Commission may, by such rules and regulations as it deems necessary or appropriate in the public interest, define and prescribe terms and conditions with respect to securities held in an investment account and transactions made in the ordinary course of business and incident to the establishment or maintenance of a primary or secondary market."

"Dealer" is defined in § 3 (a) (5) of the Act, 15 U. S. C. § 78c (a) (5).

[33] Section 16 (e), 15 U. S. C. § 78p (e), provides:

"The provisions of this section shall not apply to foreign or domestic arbitrage transactions unless made in contravention of

Rule 16b–2, 17 CFR § 240.16b–2 (1975), is unnecessary if our construction of § 16 (b) is correct. Rule 16b–2 exempts from § 16 (b) specified transactions "in connection with the distribution of a substantial block of securities." [34]

---

such rules and regulations as the Commission may adopt in order to carry out the purposes of this section."

[34] Section 16 (b) provides in its final clause that it shall not cover "any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U. S. C. § 78p (b). Rule 16b–2, 17 CFR § 240.16b–2 (1975), provides:

"(a) Any transaction of purchase and sale, or sale and purchase, of a security which is effected in connection with the distribution of a substantial block of securities shall be exempt from the provisions of section 16 (b) of the Act, to the extent specified in this § 240.16b–2, as not comprehended within the purpose of said section, upon the following conditions:

"(1) The person effecting the transaction is engaged in the business of distributing securities and is participating in good faith, in the ordinary course of such business, in the distribution of such block of securities;

"(2) The security involved in the transaction is (i) a part of such block of securities and is acquired by the person effecting the transaction, with a view to the distribution thereof, from the issuer or other person on whose behalf such securities are being distributed or from a person who is participating in good faith in the distribution of such block of securities, or (ii) a security purchased in good faith by or for the account of the person effecting the transaction for the purpose of stabilizing the market price of securities of the class being distributed or to cover an over-allotment or other short position created in connection with such distribution; and

"(3) Other persons not within the purview of section 16 (b) of the Act are participating in the distribution of such block of securities on terms at least as favorable as those on which such person is participating and to an extent at least equal to the aggregate participation of all persons exempted from the provisions of section 16 (b) of the Act by this § 240.16b–2. However, the performance of the functions of manager of a distributing group and the receipt

We do not consider these provisions to be inconsistent with our holding. Nothing on their faces would make them applicable to one selling the securities the purchase of which made him a beneficial owner. But the exemptions would be necessary to protect stockholders already qualifying as beneficial owners when they purchased [35] and they would, of course, apply to transactions by directors and officers as well.

Foremost and the *amicus* also remind us that the interpretation of the exemptive provision for which they contend has been adopted by the SEC in the past. See Brief for SEC as *Amicus Curiae* in *Reliance Electric Co.* v. *Emerson Electric Co.,* O. T. 1971, No. 70–79, pp. 22–27. But the Commission has not appeared as an *amicus* in this case. In any event, even if the Commission's views have not changed we would not afford them the deference to which the views of the agency administering a statute are usually entitled, for in *Reliance Electric Co.,* 404 U. S., at 425–427, the Court rejected the basic theory on which the SEC based its interpretation

of a bona fide payment for performing such functions shall not preclude an exemption which would otherwise be available under this § 240.16b–2.

"(b) The exemption of a transaction pursuant to this § 240.16b–2 with respect to the participation therein of one party thereto shall not render such transaction exempt with respect to participation of any other party therein unless such other party also meets the conditions of this § 240.16b–2."

[35] The press release accompanying the SEC's initial promulgation of Rule 16b–2 demonstrates this point. It explained: "The new Rule [16b–2] affords an exemption for certain cases by providing that underwriters who happen to have a member of their firm also an officer or director of the issuer or one of its principal stockholders who are regularly engaged in the business of buying and selling securities need not account to the company for profits realized from purchases and sales made in the distribution of a security for the company . . . ." SEC Release No. 34–264 (June 8, 1935).

of the exemptive provision. Our re-examination of the exemptive provision confirms the view that the SEC's theory did not reflect the intent of Congress.

The judgment is

*Affirmed.*

MR. JUSTICE WHITE joins in the judgment of the Court, and in all but Part IV–C of the Court's opinion.

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.