**Mary MAYER, Plaintiff,**

v.

**CHESAPEAKE INSURANCE COMPANY LIMITED, DWG Corporation, NVF Company, National Propane Corporation, APL Corporation, Chesapeake Financial Corporation, Southeastern Public Service Company, Victor Posner, Peabody International Corporation, the Pullman Company, and PTC Acquisition, Inc., Defendants.**

No. 85 Civ. 7958 (JFK).

United States District Court,
S.D. New York.

Oct. 11, 1988.

Milberg, Weiss, Bershad, Specthrie & Lerach, New York City (Richard M. Mayer, Wendy K. Goidel, of counsel), for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Colleen McMahon, Orin S. Snyder, of counsel), for defendants.

FINDINGS of FACT and
CONCLUSIONS of LAW

KEENAN, District Judge:

*Factual Findings*

In the main, the facts have been stipulated to. They are also set forth in the Court's Opinion and Order of January 30, 1987. Three witnesses testified at trial and the deposition of defendant Victor Posner was received. Where that testimony is relied on for a factual conclusion, the Court will so note. Otherwise, the stipulated facts are the source of the Court's factual statements.

Plaintiff Mary Mayer ("Mayer") brought this action pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78p(b) ("Section 16(b)") against the named corporations and Victor Posner ("Posner"). She seeks to recover on behalf of defendant Peabody International Corporation ("Peabody") $5.6 million in short-swing profits allegedly realized by some defendants from the purchase and sale of Peabody stock. Mayer is a shareholder of common stock of Peabody, a Delaware corporation. The remaining defendant corporations, except for The Pullman Company ("Pullman") and PTC Acquisition, Inc. ("PTC"), are owned or controlled by Posner who resides in Miami Beach, Florida. He was and is Chairman, President and Chief Executive Officer of the other seven defendant corporations. As of September 21, 1985, Posner and Security Management Corporation ("SMC"), a private corporation and trust created for the benefit of Posner and his family, owned between 35% and 38% of the common stock of defendant NVF Company ("NVF") and 16.8% of the common stock of defendant DWG Corporation ("DWG"). As of Sep-

tember 21, 1985, NVF owned a majority of the stock of defendant APL Corporation ("APL"), which is incorporated in New York. NVF also owned and controlled Chesapeake Financial Corporation, Inc. ("Chesapeake Financial"), incorporated in Florida, and Chesapeake Insurance Company, Ltd. ("Chesapeake Insurance"), a Bermuda corporation. DWG had a wholly-owned subsidiary, defendant National Propane Company ("Propane"), incorporated in Delaware. DWG also controlled and was the majority shareholder of Southeastern Public Service Company, a Delaware corporation.

Just prior to August 7, 1985, Chesapeake Insurance, DWG and Propane amongst them held a total of approximately 23% of Peabody's common stock. The companies, together with their affiliates and Victor Posner, filed schedules 13D disclosing their investment and stating that they may be deemed to constitute "a group" for purposes of Section 13 of the Securities Exchange Act of 1934, 15 U.S.C. § 78m, and Rule 13d–5, 17 C.F.R. § 240.13d–5 promulgated thereunder.

Between November 1983 and April 1984, Peabody and Chesapeake Insurance negotiated concerning a proposed consensual tender offer for Peabody stock and, towards the end of that period, a possible merger. The negotiations ended in April 1984 without success. Shortly thereafter, Peabody made a self-tender offer for 2.3 million of its shares, but withdrew the offer after Chesapeake Insurance, DWG and Propane brought a derivative suit in Dade County, Florida, to enjoin the offer.

On June 19, 1985 Peabody signed a defensive merger agreement with Pullman, under which Peabody's stockholders were to receive 1.65 shares of Pullman stock for each share of Peabody stock they owned. The two corporations were to merge under the name "The Pullman–Peabody Company." Peabody also granted Pullman an option to purchase over 2 million shares of Peabody stock should any person acquire or offer to acquire a 20% interest in Peabody, or should any shareholder or group of shareholders holding 20% of Peabody's stock increase their holdings by 5% or more. This option essentially "locked up" 18% of Peabody's stock, diluted the holdings of the shareholders affiliated with Posner ("the Posner Group") and gave Pullman the ability to block a competing proposal.

Between August 7, 1985 and September 19, 1985, APL purchased over 1,421,800 shares of Peabody stock. It had previously owned no Peabody stock. During the summer of 1985, representatives of Peabody and Pullman, among them Thomas M. Begel ("Begel"), Chief Executive Officer of Pullman and Steven Shulman ("Shulman"), a Pullman director, met with Posner to attempt to convince him not to oppose their merger. Failing to do so, Peabody and Pullman signed two additional agreements on August 27, 1985: a Preferred Stock Exchange Agreement and an Amendment Agreement. Under the Preferred Stock Exchange Agreement, Peabody issued Pullman 1.5 million shares of "Series A Preferred Stock," each share being entitled to seven votes which were required under the Amendment Agreement to be cast in favor of the Peabody–Pullman merger.

On August 21, 1985 Peabody brought suit in the District of Connecticut against Posner, Chesapeake Insurance, DWG, Propane and APL alleging that they had violated Sections 10(b) and 13(d) of the Act by filing false schedules 13D and had manipulated the market by failing to disclose an intention to take over Peabody. The defendants in that action filed counterclaims against Peabody and its directors and impleaded Pullman and its Chairman.

On September 5, 1985, the 13D reporting defendants—Chesapeake Insurance, Chesapeake Financial, DWG, Propane, Southeastern Public Service Company (SEPSCO), and APL—filed an amendment to the Schedule 13D in which they announced their opposition to the Pullman–Peabody merger and disclosed that "[t]he reporting persons presently expect to challenge in an appropriate legal proceeding, among other things, the purported granting of [the poison pill] option and the purported issuance of such preferred stock."

On September 20, 1965, Peabody, Pullman and the Posner Group entered into a settlement agreement under which the pending litigations in Florida and Connecticut were discontinued in exchange for a payment from Peabody and Pullman to the Posner Group of $5.6 million. Peabody and Pullman agreed to pay the Stockholders a total of $5.6 million. Five million dollars of that sum was distributed among the four Stockholder Defendants as follows: $1,770,000 to APL, $2,870,000 to Chesapeake Insurance, $330,000 to Propane, and $30,000 to DWG. The remaining $600,000 was paid to defendants' counsel. The Posner Group also agreed to refrain for five years from taking particular actions which would lead to their control of Peabody or Pullman and from interfering with the Pullman–Peabody merger. On the same day the settlement agreement was executed, the Posner Group sold its holdings of Peabody stock to unidentified institutional investors at a price of $10.375 per share.

Mayer alleges that the $5.6 million paid to the Posner Group under the settlement agreement formed part of the consideration for the sale of the Posner Group's holdings in Peabody stock. She further contends that each member of the Posner Group was a beneficial owner of more than 10% of the outstanding common stock of Peabody immediately prior to August 7, 1985. Accordingly, Mayer alleges, the purchase of Peabody stock by APL between August 7, 1985 and September 19, 1985, and the sale of the Posner Group's shares of Peabody stock on September 20, 1985 fall within the ambit of Section 16(b) and $5.6 million paid to the Posner Group must be disgorged and paid to Peabody.

Plaintiff called one Charles Davis as her expert witness. He testified that the settlement agreement and the standstill portions thereof were worth zero dollars and that the $5.6 million payment under the agreement was therefore a hidden premium for the sale of the stock. The Court rejects this opinion. Mr. Davis had no particular life experience, education or background which supplies reliability, credence or prestige to his opinion. His undergraduate degree was in physics and his doctorate in mathematical logic. Although an obviously intelligent man, his business background supplied him with no yardstick to evaluate a standstill agreement. Moreover, he had never previously testified in a case involving Section 16(b) of the Act nor did he have any particular reason to be able to evaluate a standstill agreement where litigation was involved.

Thomas Begel, the Director, President and Chief Executive Officer of Pullman, was called by plaintiff and testified to the negotiations with Posner during the summer of 1985 whereby he sought to convince Posner that the merger of Peabody and Pullman was a good idea. Begel wanted Posner's support for the merger. They met together in Florida on June 24, 1985, July 18, 1985, July 29, 1985 and August 13, 1985. Begel and Posner spoke by telephone on August 15, 1985.

On July 18, 1985 Begel offered $2 million for a standstill agreement whereby Chesapeake Insurance, DWG and Propane would refrain from increasing their 23% interest in Peabody and would vote for the merger. It was not contemplated, so cross-examination of Begel developed, that the three corporations would sell their combined 23% of the Peabody stock as a condition of receiving the $2 million. Posner, on behalf of the three corporations rejected Begel's July 18 offer. At the July 29 meeting, Begel offer $4 million for the same standstill agreement, again without any promise that the three corporations would sell their stock in Peabody.

Between August 7, 1985 and September 19, 1985, APL acquired 1,421,800 shares of Peabody common stock in open market purchases.

Jerome Coopersmith, Senior Vice President and Chief Financial Officer of several of the defendant corporations, who reports to Posner testified for the defense. He testified that none of the corporate defendants received any financial benefit from the sale of Peabody stock that they did not own. Manufacturers Hanover Bank statements (Defendants' Exh. H) corroborate

that the sale proceeds were deposited in the bank accounts of DWG, Chesapeake Insurance, Propane and APL and Stipulated Fact 39 states that "[e]ach of the four selling defendants received the entire proceeds from the sale of the shares owned by it." Coopersmith also testified that Posner himself got nothing personally directly from the sales. There is no evidence that defendants commingled funds and no credible evidence that Posner's salary was augmented as a result of the trading in Peabody stock.

On August 23, 1985 APL became record owner of more than 10% of Peabody's common stock bringing it within the ambit of Section 16(b). It purchased 290,100 shares after that and by September 19, 1985 APL owned 11.4% of Peabody's common stock. *See* Stipulated Fact 28.

## CONCLUSIONS OF LAW

■ Section 16(b) of the Act provides in pertinent part that:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer....

Plaintiff contends that all members of the so-called Posner group, as well as Posner, were beneficial owners of the Peabody stock within the meaning of Section 16(b). Although the definition of "beneficial ownership" has not been widely discussed, courts which have considered the issue have required that the beneficial owner or "insider" realize some direct pecuniary benefit from the purchase and sale of the securities. *See Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); *Margolies v. Rea Brothers*, 1982–83 Fed.Sec.L.Rep. Transfer Binder (CCH) ¶ 99,261 (S.D.N.Y. 1983) [available on WESTLAW, 1983 WL 1333]; *CBI Industries, Inc. v. Horton*, 682 F.2d 643, 646 (7th Cir.1982). In the present case, Mr. Coopersmith testified that none of the corporate defendants received any financial benefit from the sale of shares they did not own. The proceeds from the sale of the shares was divided among DWG, Chesapeake Insurance, Propane and APL according to the number of shares previously held by each. The evidence also indicated that Posner himself received no direct benefit from the sale of the shares. Only APL received proceeds from the sale of 290,100 Peabody shares bought on or after August 23, 1985, which shares fell within the purview of Section 16(b). Thus, only APL can be deemed a beneficial owner of shares under Section 16(b).

■ Plaintiff also argues, that the $5.6 million paid to the Posner group was actually payment for the sale of the Posner group shares and should thus be considered profit under Section 16(b). The Court disagrees and concludes that the standstill agreement was not worthless. The standstill agreement ended substantial opposition to the merger of Peabody and Pullman, insured peace for Pullman–Peabody for five years and terminated two different lawsuits which had challenged the merger. It is also significant that the Posner group had been offered $4 million as late as July 29, 1985 without any requirement that its Peabody shares be sold. Courts have held that so-called "standstill agreements," which guarantee that one party will not seek to attempt a takeover of another, do have value in and of themselves. *See Herrmann v. Steinberg*, 812 F.2d 63, 67 (2d Cir.1987); *Colan v. Continental Telecom, Inc.*, 616 F.Supp. 1521, 1527–28 (S.D.N.Y. 1985), *aff'd*, 788 F.2d 2 (2d Cir.1986). Thus, the entire $5.6 million is not subject to Section 16(b) treatment. In the Court's view, the standstill agreement was worth at least $4.6 million to Pullman–Peabody ($4 million for the settlement and standstill agreement and $600,-000 for counsel fees and litigation expenses). Hence, $1 million of the $5.6 million should be regarded as consideration for the sale of the Peabody shares by APL.

The next question is what profits APL must disgorge, as the only entity subject to Section 16(b) liability. The only shares which come under Section 16(b) are the 290,100 Peabody shares purchased by APL after August 23, 1985, since APL did not become the beneficial owner of more than 10% of Peabody stock until August 23. *See* Joint Pre-trial Order, Stipulated Fact 28. *See Foremost–McKesson v. Provident Securities Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976); *Herrmann*, 812 F.2d at 64. The total purchase price of these shares was $3,061,012.50 and adding brokerage commissions of $9189.00, the relevant purchase price is $3,070,201.50. *See* Joint Pre–Trial Order, Stipulated Fact 27. *See Herrmann*, 812 F.2d at 65 (only non-incidental expenses not deductible from short swing profits); *Texas International Airlines v. National Airlines, Inc.*, 714 F.2d 533, 542 (5th Cir.1983) (brokerage commissions properly deductible from short swing profits), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984); *Reece Corp v. Walco Nat. Corp.*, 565 F.Supp. 158, 166 (S.D.N.Y. 1983) (same).

The price received for the sale of APL's 1,421,800 shares was $14,751,175 (1,421,800 × $10.375/per share net to APL). *See* Joint Pre–Trial Order, Stipulated Fact 39. Since $1 million or 17.8% of the $5.6 million paid to the Posner Group was found by this Court to constitute consideration for the sale of the shares, $315,060 (17.8% of $1,770,000 received by APL) should be added to the money received by APL for the sale of all its 1,421,000 shares. This amount added to the actual purchase price amounts to a total of $15,066,235. This amount divided by the 1,421,800 shares comes to $10.60 per share. Thus, APL received a total of $3,075,060 only for the 290,100 subject shares. Thus, APL's short-swing profits amount to $4858.50 (sale price of $3,075,060.00 minus purchase price of $3,070,201.50).

## CONCLUSION

For the foregoing reasons, plaintiff is awarded $4858.50 plus interest as short-swing profits obtained by defendant in violation of Section 16(b) of the Securities Act. Judgment should be entered accordingly and this case is to be removed from the active docket of this Court.

SO ORDERED.