**C.R.A. REALTY CORP., Plaintiff,**

v.

**TRI–SOUTH INVESTMENTS and Drexel Burnham Lambert, Inc., Defendants.**

**No. 81 Civ. 6611 (ADS).**

United States District Court, S.D. New York.

Aug. 17, 1983.

David Lopez, P.C., New York City, for plaintiff.

Hess, Segall, Guterman, Pelz, Steiner & Barovick, New York City, for defendant Drexel Burnham Lambert, Inc.; Charles H. Miller, Michael P. Zweig, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

Between June 5, 1979 and November 11, 1981 defendant Drexel Burnham Lambert, Inc. ("DBL") purchased and sold convertible debentures and common stock of defendant Tri-South Investments ("TSI"), a company in which over 10% of the common stock was owned by DBL. Plaintiff C.R.A. Realty Corp. is a TSI shareholder. It claims that DBL's transactions in TSI securities from June 1979 to November 1981 violated § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Under § 16(b) all profits gained in less than six months on transactions of a corporation's securities by a corporate officer, director, or 10% owner are presumed to be unfairly based on the misuse of inside information. The provision authorizes corporate shareholders to sue for recovery by the corporation of these presumptively improper "short swing" profits.

DBL has moved for summary judgment based on the so-called market-maker exception to § 16(b), created in 1963 by a new § 16(d) of the 1934 Act, 15 U.S.C. § 78p(d). Section 16(d) provides that subsection (b) "shall not apply to any purchase and sale, or sale and purchase . . . of an equity security not then or theretofore held by him in an investment account by a dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market . . . for such security." Thus, notwithstanding its 10% ownership of a class of a company's securities, a securities dealer such as DBL is not liable under § 16(b) for "short swing" profits earned in transactions in a class of the company's securities, provided the transactions giving rise to such profits were "incident to" the dealer's making a market in the transacted securities.

■ Section 3(a)(38) of the 1934 Act, 15 U.S.C. § 78c(a)(38), in relevant part, defines a market maker as:

any dealer, who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis.

Affidavits submitted by DBL establish that, from June 5, 1979 to November 11, 1981, DBL was making a market in TSI 7% and 10% convertible debentures, not simply trading such securities for its own account. See Eng Affidavits (Feb. 7, 1983 & April 4, 1983); Rosenthal Affidavit (March 31, 1983); Wallace Affidavit (March 31, 1983); Byrnes Affidavit (March 24, 1983); A. Bascone Affidavit (March 31, 1983); L. Bascone Affidavit (March 31, 1983). Plaintiff has attempted to counter this evidence by pointing out that DBL was not listed as a market-maker in TSI 7% convertibles in the National Daily Quotation Service's "yellow sheets" until July 20, 1981, almost eight months after the last 7%-convertible transaction alleged in the complaint. In addition, plaintiff's evidence indicates that DBL did not appear in the "yellow sheets" as a TSI 10% convertible market-maker until October 22, 1979, almost two months after the first 10%-convertible transaction alleged in the complaint. See Plaintiff's Memorandum at 6 & Ex. E; Plaintiff's Rebuttal Memorandum at 5.

■ As indicated by § 3(a)(38)'s market-maker definition, however, a dealer need not be listed in an inter-dealer communications system such as the "yellow sheets" in

order to qualify as a market maker in a particular security. DBL's affidavits of individuals who were directly involved in the TSI convertible-debenture market during the time period covered by the complaint specifically aver that DBL was considered a TSI convertibles market-maker, notwithstanding that DBL may not have been so listed in the "yellow sheets" at some points in time. *See* Eng Affidavit ¶ 4 (April 4, 1983); Rosenthal Affidavit ¶¶ 5–6; Wallace Affidavit ¶ 6; Byrnes Affidavit ¶ 4; L. Bascone Affidavit ¶ 4. Thus, plaintiff has failed to raise an issue of fact concerning DBL's market-maker status, by merely establishing its late "yellow sheet" listings.

Plaintiff further claims that the limited number and relative infrequency of DBL's transactions in TSI debentures contradict DBL's claim to market-maker status. *See* Plaintiff's Rebuttal Brief at 5–8. But, as defined by § 3(a)(38), a market maker is a dealer who holds himself out as willing to buy and sell a particular security, not necessarily a dealer who actually buys and sells the security a certain number of times. The TSI debenture transactions alleged in the complaint are not nearly so few and infrequent as to rebut the extensive written testimony submitted by defendant DBL concerning its known willingness to buy and sell 7% and 10% TSI convertible debentures. *See* Rosenthal Affidavit ¶ 3; Wallace Affidavit ¶ 4; Byrnes Affidavit ¶ 3; A. Bascone Affidavit ¶¶ 3–4; L. Bascone Affidavit ¶ 3. As the Second Circuit has stated, "the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party. The litigant opposing summary judgment ... may not rest upon mere conclusory allegations or denials as a vehicle for obtaining trial." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (citations omitted).

Plaintiff also asserts that DBL may not have filed an SEC-required form disclosing when DBL started and stopped making a market in TSI debentures. *See* Plaintiff's Rebuttal Memorandum at 8–9. DBL has apparently been unable to establish whether it ever considered filing this form, but the filing requirement relied upon specifically related only to market-making in exchange-listed common stocks, not convertible debentures. *See* 17 C.F.R. § 240.-17(a)(9) (1981). Moreover, the requirement was rescinded as unnecessary in September 1981, *see* SEC Release # 18101 (Sept. 21, 1981), 3 Fed.Sec.L.Rep. (CCH) ¶ 83,031, and thus, even if the requirement were applicable to part of DBL's June 1979 to November 1981 market making in TSI convertible debentures, enforcement of the requirement by precluding DBL from claiming market-maker status under § 16(d) would be inappropriate.

Plaintiff finally argues that, even if DBL was a market maker in TSI 7% and 10% convertible debentures, then DBL still may not take full advantage of § 16(d) because most of the purchase-and-sale transactions alleged in the complaint involved purchases or sales of TSI common stock, not just purchases and sales of TSI convertible debentures. *See* Plaintiff's Rebuttal Memorandum 2–4, 9–10. This argument has superficial appeal based on a strictly literal reading of § 16(d). Subsection (d) explicitly excludes from subsection (b) only transactions in a security that are incident to market making in that same security; transactions in a security that are incident to market making in another security, *e.g.,* transactions in common stock incident to market making in convertible debentures, are not expressly covered by § 16(d). Thus, according to plaintiff, even if DBL transactions involving TSI common stock were incident to DBL market making in TSI 7% and 10% convertible debentures, § 16(d) does not except those transactions from § 16(b)'s proscription of "short swing" trading by insiders.

A remarkable dearth of either regulatory or judicial guidance exists on this question. The statutes and policies that are relevant, however, make plaintiff's suggested application of § 16(d) to DBL's market-making

activities seem unduly narrow and formalistic.[1]

Section 16(d) is a broad exception to § 16(b), designed to avoid hampering bonafide, market-making activity with the threat of no-fault liability for "short swing" profits. The SEC proposed the special exception for all market makers in lieu of a Special Study Group's narrower recommendation that the Commission be authorized to grant individual market-maker exemptions on a case-by-case basis. *See* Painter, *supra* note 1, at 364–66. In opting for a broader approach, the SEC specifically noted that excepting all market makers from no-fault liability under § 16(b) did not entail legalizing the misuse of inside information, given the existence of enforcement alternatives such as inspections, reporting requirements, and the antifraud provisions of the securities acts. *See id.* at 366 (quoting Senate Hearings); *see also id.* at 371 n. 47 (quoting House debate). Indeed, the Supreme Court has recognized that, although the existence of alternative sanctions does not directly affect the scope of § 16, a reading of the statute that resolves ambiguities against imposing liability under § 16(b) is supported by the existence of antifraud statutes that specifically proscribe trading on the basis of inside information. *Foremost-McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 255, 96 S.Ct. 508, 521, 46 L.Ed.2d 464 (1976). Moreover, the Court has generally suggested the need to construe liberally statutory exemptions to the harsh liability without fault imposed by § 16(b), particularly where, as here, that liability results from a presumption of insider status based on a defendant's 10% ownership, as opposed to a position as an officer or director of the issuer. *See Foremost-McKesson,* 423 U.S. at 251–54, 96 S.Ct. at 519–20 ("It is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language. If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference.").

In this case evidence submitted by DBL demonstrates the necessary relation between transactions in TSI common stock and TSI 10% convertible debentures. According to the unrebutted affidavit of a DBL trader involved in the purchases and sales of TSI securities alleged in the complaint, "TSI 10% debentures generally trade at a price that reflects, and is roughly equivalent to, the price of TSI common stock.... Purchases and sales of the stock, the 10% bonds, and conversion of the 10% bonds, were integrally and inseparably linked.... [O]ne could not make and maintain a market in the convertible debentures without concomitantly trading in the equity issue into which the debentures were convertible." Rosenthal Affidavit ¶¶ 7–8; *see also* A. Bascone Affidavit ¶ 4 (sporadic trading in TSI 10% convertible debentures described as a necessary result of price fluctuations of TSI common stock).

On a more general level, the SEC itself has recognized the necessary relation between any corporation's common stock and its convertible debentures. The Commission's regulations provide that in determining a person's 10% ownership of any class of equity security under § 16 "such person shall be deemed to be the beneficial owner of securities of such class which such person has the right to acquire through ... the conversion of presently convertible securities." 17 C.F.R. § 240.16a–2; *see also Foremost-McKesson,* 423 U.S. at 237 n. 5, 96 S.Ct. at 513 n. 5. Given the absence of regulatory elaboration of § 16, a general

---

1. The SEC has not promulgated regulations detailing the scope of the § 16(d) exception, despite the subsection's explicit statement that the "Commission may ... define and prescribe terms and conditions with respect to ... transactions made in the ordinary course of business and incident to the establishment or maintenance of a primary or secondary market." *Cf.* Painter, *Section 16(d) of the Securities Exchange Act: Legislative Compromise or Loop-*

*hole?,* 113 U.Pa.L.Rev. 358, 374 (1965) ("[Market-maker exception] appears to be a particularly difficult area in which to set boundaries or even guidelines. It will be interesting to see what success the Commission attains in doing so."). Moreover, no reported cases interpreting the exception have been found, a notable occurrence in the highly litigated securities field.

rule placing common stock transactions within the § 16(d) exception whenever they are incident to market making in the same corporation's convertible debentures might too greatly impinge on the language of § 16(d). But a common-sense interpretation of the market-maker exception to no-fault liability for "short swing" profits requires that DBL's TSI-common-stock transactions be deemed within § 16(d) by virtue of the unrebutted evidence establishing their inextricable and direct connection with DBL's market-making in TSI 10% convertibles.[2]

The decision in favor of DBL's defense based on its status as a market maker in TSI convertible debentures makes unnecessary any ruling on the other substantial defenses raised in DBL's motion for summary judgment, including those based on SEC Rule 16b–9 (dealing with conversion of debentures under § 16(b)), and on § 16(e) of the 1934 Act (providing a § 16(b) exemption for arbitrage transactions). Defendant's motion for summary judgment is granted. Fed.R.Civ.P. 56(b).

SO ORDERED.

---

**2.** Defendant's avowed reliance on the § 16(d) exception in electing to trade TSI common stock is itself entitled to some weight. *See* Rosenthal Affidavit ¶ 9. Given the dearth of case law and the absence of congressionally invited SEC regulation, this reliance appears reasonable, and it is relevant both as an equitable concern and as evidence of an industry understanding that deserves consideration in deciding the scope of § 16(d).