**C.R.A. REALTY CORPORATION,**
Plaintiff-Appellant,

v.

**TRI–SOUTH INVESTMENTS and Drexel Burnham Lambert, Inc.,**
Defendants-Appellees.

**No. 774, Docket 83–7798.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 22, 1984.

Decided June 22, 1984.

Lawrence N. Weiss, New York City (David Lopez, P.C., New York City, on the brief), for plaintiff-appellant.

Charles H. Miller, New York City (Michael P. Zweig, Hess, Segall, Guterman, Pelz, Steiner & Barovick, New York City, on the brief), for defendants-appellees.

Daniel L. Goelzer, Gen. Counsel, Washington, D.C. (Jacob H. Stillman, Associate Gen. Counsel, David A. Sirignano, Asst. Gen. Counsel, Gerard S. Citera, Paul Gonson, Washington, D.C., of counsel), for amicus curiae S.E.C.

Before NEWMAN and KEARSE, Circuit Judges, and TENNEY, District Judge.*

* Honorable Charles H. Tenney, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

KEARSE, Circuit Judge:

Plaintiff C.R.A. Realty Corporation ("CRA"), a shareholder of the nominal defendant Tri-South Investments ("TSI"), appeals from a final judgment of the United States District Court for the Southern District of New York, Abraham D. Sofaer, *Judge*, dismissing its complaint against defendant Drexel Burnham Lambert, Inc. ("Drexel"), which sought to recover amounts allegedly due TSI pursuant to § 16(b) of the Securities Exchange Act of 1934 ("1934 Act" or "Act"), 15 U.S.C. § 78p(b) (1982), on account of Drexel's short-swing trading in TSI securities while Drexel was the beneficial owner of more than ten percent of TSI's common stock. The district court granted Drexel's motion for summary judgment dismissing the complaint on the ground that Drexel was a market maker in TSI securities and hence was exempted by § 16(d) of the 1934 Act, 15 U.S.C. § 78p(d) (1982), from liability for short-swing profits under § 16(b). On appeal, CRA contends that the exemption provided by § 16(d) is inapplicable as a matter of law because Drexel enjoyed short-swing profits in TSI's common stock but at most was a market maker only in its convertible debentures, and that even if the exemption were applicable in theory, the court should not have granted summary judgment since genuine issues of fact exist. We disagree with both contentions and affirm the judgment of the district court.

## I. BACKGROUND

A. *The Events and the Complaint*

The lawsuit focuses on trading by Drexel in securities of TSI during the period from June 5, 1979, to November 11, 1981. Most of the facts are undisputed. TSI had three classes of securities, each listed and traded on a national securities exchange: a common stock, a 7% convertible subordinated debenture, and a 10% convertible debenture. The debentures were convertible at the option of their holders into shares of TSI common stock without the payment of additional consideration.

Drexel, a broker-dealer in securities, owned more than 10% of TSI's common stock. During at least part of the period in question, Drexel held itself out to be a market maker in TSI's convertible debentures. It was not a market maker in TSI common stock. Within each class of TSI securities, between June 1979 and November 1981, Drexel made purchases and sales, or sales and purchases, within periods of less than six months ("short-swing" transactions). CRA instituted the present action as a shareholder of TSI, contending that, under § 16(b) of the 1934 Act, TSI was entitled to recover Drexel's profits from its short-swing transactions.

Following a period of discovery, Drexel moved for summary judgment on the ground, *inter alia*, that it was a market maker in TSI debentures, and that § 16(d) of the 1934 Act therefore exempted all of its transactions in TSI securities from the scope of § 16(b). CRA opposed the motion, contending that Drexel had not consistently been a market maker in the convertible securities during the period in question. It presented affidavit evidence that Drexel had listed itself in an inter-dealer quotation service published daily by The National Quotation Bureau, and known informally as the "Yellow Sheets," as a market maker in the convertible debentures only on certain dates and not on others. CRA contended that the sporadic character of Drexel's listings and transactions contradicted its claim to status as a market maker, and that its short-swing transactions in the debentures were thus not exempted by § 16(d). Further, it contended that even if Drexel had been a market maker in the debentures, none of Drexel's transactions in TSI common stock were exempted by § 16(d) since Drexel was at no pertinent time a market maker in that stock. CRA cross-moved for summary judgment in its favor.

In opposition to CRA's cross-motion and in further support of its own motion, Drex-

el presented affidavits of two of its employees and of four independent broker-dealers, stating that, notwithstanding the Yellow Sheets, Drexel had in fact at all pertinent times held itself out to other dealers as willing to buy and sell TSI convertible debentures for its own account at reasonable prices on a regular and continuous basis. Drexel stated that its transactions in TSI common stock were incident to and in connection with its market-making activities in the convertible securities, because there was a necessary relationship between the common stock and the 10% convertible debentures, in that the two securities traded in step with each other and at roughly equivalent prices.

### B. *The Decision of the District Court*

The district court, in an opinion dated August 17, 1983, and reported at 568 F.Supp. 1190, granted Drexel's motion for summary judgment and dismissed the complaint. The court ruled that the affidavits presented by Drexel were sufficient to establish that Drexel had been a market maker in TSI debentures throughout the pertinent period, and that CRA's evidence as to the gaps in the Yellow Sheets did not create an issue of material fact. Hence, § 16(d) exempted Drexel's transactions in TSI debentures from § 16(b)'s provisions.

With respect to Drexel's trading in TSI common stock, the court noted that there were neither any regulations promulgated by the Securities and Exchange Commission ("SEC" or "Commission") nor any reported judicial decisions interpreting the applicability of § 16(d)'s market-maker exception to the situation where the short-swing transaction occurred in one class of security and the market making was performed in another. The court observed that the literal language of § 16(d) exempted from § 16(b) only transactions in a security that are incident to market making in the same security. Nevertheless, recognizing that § 16(b) exposes those covered by its terms to harsh liability without fault, and that § 16(d) is a "broad exception to § 16(b), designed to avoid hampering bona

fide, market-making activity with the threat of no-fault liability for 'short swing' profits," 568 F. Supp. at 1193, the court concluded that § 16(d) should be read liberally in order best to effectuate its purposes. It noted that Drexel's unrebutted affidavits demonstrated that there was a necessary relationship between transactions in TSI common stock and TSI 10% convertible debentures, in that the debentures generally traded at a price that reflected and was roughly equivalent to the price of TSI common stock. The court concluded that "a common-sense interpretation of the market-maker exception to no-fault liability for 'short swing' profits requires that [Drexel's] TSI-common-stock transactions be deemed within § 16(d) by virtue of the unrebutted evidence establishing their inextricable and direct connection with [Drexel's] market-making in TSI 10% convertibles." *Id.* at 1194 (footnote omitted).

Accordingly, the court granted summary judgment dismissing the complaint. This appeal followed.

### II. DISCUSSION

In support of its appeal, CRA contends principally that the district court's interpretation of § 16(d) was contrary to the statute's plain meaning and legislative history and to sound public policy. CRA also contends that, in any event, the court improperly decided genuine issues of material fact that should have been reserved for trial.

Following oral argument of this appeal, this Court invited the SEC to express its views as to the applicability of the exemption created by § 16(d). The Commission has filed a brief taking the position that the common stock trading by a brokerage firm, if incidental to the firm's market-making activity in the same issuer's debentures that are convertible into the common stock, is exempted by § 16(d) from the short-swing profits provisions of § 16(b).

For the reasons below, we agree with the SEC as to the scope of the § 16(d) exemption, and we agree with the district court that summary judgment was proper.

A. *Applicability of § 16(d)*

Section 16(b) of the 1934 Act provides, in pertinent part, as follows:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner [of 10% of a class of equity security], director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months.

Section 16(d) provides, in pertinent part, as follows:

> The provisions of subsection (b) of this section shall not apply to any purchase and sale, or sale and purchase, ... of an equity security not then or theretofore held by him in an investment account, by a dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market ... for such security.

Section 3(a)(11) of the 1934 Act, 15 U.S.C. § 78c(a)(11), defines an "equity security" to include not only stock, but also any security that is convertible into stock. Section 3(a)(38), 15 U.S.C. § 78c(a)(38), defines a "market maker" as

> any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis.

Given the language, legislative history, and goals of these provisions, we conclude that § 16(d) exempted Drexel from liability for its trades in TSI common stock if they were incident to its market-making activity in TSI debentures.

Section 16(b) was enacted in 1934 to " 'curb the evils of insider trading [by] ... taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great.' " *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 243, 96 S.Ct. 508, 516, 46 L.Ed.2d 464 (1976) (quoting *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972)). Congress accomplished this purpose by creating the conclusive presumption that directors, officers, and beneficial owners of more than 10% of a class of the corporation's equity securities had access to inside information and by providing for recapture of all short-swing profits obtained by these statutory insiders, regardless of whether they actually had inside information and regardless of their motive or intent. *Id.* 423 U.S. at 243–44, 96 S.Ct. at 516. Since the liability imposed is strict and the remedy harsh, however, courts have been chary of holding transactions within § 16(b) unless Congress's intent to make the section applicable was clear. *See, e.g., id.* at 252, 96 S.Ct. at 520 ("It is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language. If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference."); *Blau v. Lamb*, 363 F.2d 507, 515–19 (2d Cir.1966) (given the lack of clarity as to whether conversion of preferred stock into common constitutes a "sale" within § 16(b), section should not be applied unless use of inside information is implicated), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

In 1964 the Act was amended to bring the securities of companies traded over-the-counter within the short-swing profits provisions of § 16(b). Pub.L. No. 88–467, § 8(a), 78 Stat. 565, 579 (1964); *see* H.R. Rep. No. 1418, 88th Cong., 2d Sess. 29 (1964); S.Rep. No. 379, 88th Cong., 1st

Sess. 69 (1963), U.S.Code Cong. & Admin. News 1964, 3013. Congress and the Commission were aware, however, that without an exemption, ordinary market-making activity in over-the-counter securities by firms that were insiders by reason of the size of their stock holdings would result in repeated liability under § 16(b), *see* Hearings on H.R. 6789, H.R. 6793, and S. 1642 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 88th Cong., 1st and 2d Sess. 1227–28 (1963–64) (statement of SEC Chairman Cary), and there was concern that the threat of such liability would cause a reduction of the market-making activities of these firms, *see* Hearings on S. 1642 Before a Subcomm. of the Senate Comm. on Banking and Currency, 88th Cong., 1st Sess. 400–01 (1963) (statement of the SEC). In order to encourage market making by removing the § 16(b) threat, therefore, Congress adopted a proposal by the Commission for a general exemption for market-making activity, and enacted § 16(d) to exempt from § 16(b) all transactions in "an equity security ... by a dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market ... for such security." 15 U.S.C. § 78p(d).

CRA focuses on the use of the phrase "such security" in § 16(d) to argue that the exemption for market-making activity applies only to the security in which the market making occurs and that "such security" here can mean only the convertible debentures. While this is not an implausible reading of the statute, it is not the only plausible reading. The phrase "such security," in § 16(d) refers back to "equity security," and in attempting to fathom the meaning of that term we look to the statutory definition. Section 3(a)(11) defines "equity security" to encompass not only "stock," but also "any security convertible ... into such a security." Reading § 16(d) with this definition in mind, therefore, the phrase "such security" could refer to either the common stock or any security convertible into the common stock. *Cf. Blau v. Lamb, supra,* 363 F.2d at 521–25 (converti-ble security and security into which it is convertible are economic equivalents since they are merely "different forms of the same participation in [the] issuer," *id.* at 523). Thus, we conclude that § 16(d) does not clearly have the meaning that CRA attributes to it. Lacking a clearer expression by Congress of an intention to impose strict § 16(b) liability for trades in common stock incident to market making in a debenture convertible into the common, we decline to accept CRA's construction of § 16(d). *See Foremost-McKesson, Inc. v. Provident Securities Co., supra.*

Recognition of the possibility that Congress intended "such security" to refer both to convertible securities and to stock of the same issuer into which the security is convertible is consistent with both the realities of the marketplace and the congressional goal of facilitating market-making activity. Market makers in convertible securities frequently hedge their positions in the convertible by trading in the underlying common stock to avoid some of the risk inherent in market making. A dealer with substantial holdings of the convertible securities may sell the common stock short to offset risks of adverse market swings. A dealer may also be more willing to hold a large market-making position in the convertible security if it knows it can convert and then sell the underlying security in the more liquid equity market. An interpretation of § 16(d) that would exempt these common stock trades would encourage dealers to make markets in the convertible securities by permitting them to limit the risk inherent in holding a position in the convertible securities. The more dealers that are willing to make markets in the convertible securities, the greater the depth and liquidity of those markets and the greater the competition. *See* Note, *Section 16(d) Exemption for Market-Makers,* 60 Nw.U.L.Rev. 367, 372–74 (1965).

The conclusion that common stock and securities of the same issuer that are convertible into the common should be treated as economic equivalents is also supported by several of the Commission's rules and

regulations. SEC Rule 16a–2(b), 17 C.F.R. § 240.16a–2(b), provides that, in determining a person's 10% ownership of a class of equity security under § 16, "such person shall be deemed to be the beneficial owner of securities of such class which such person has the right to acquire through ... the conversion of presently convertible securities." Similarly, Rule 16b–9, 17 C.F.R. § 240.16b–9, treats conversions of securities into common stock as having no significance for the purpose of determining § 16(b) liability unless such conversions are combined with certain other transactions in the securities. *See also* Rule 13d–3, 17 C.F.R. § 240.13d–3 (two securities equivalent for purposes of defining beneficial owners of 5% of an issuer's securities under § 13(d) of the 1934 Act); Rule 10b–6(b), 17 C.F.R. § 240.10b–6(b) (two securities equivalent for purposes of defining a distribution under Rule 10b–6).

CRA predicts that the exemption of a debenture market maker from § 16(b) liability for trading in the common stock into which the debenture is convertible will lead to rampant pernicious insider trading in common stock by these broker-dealers. We are not persuaded. The exemption provided by § 16(d) extends only to trading that is "incident to" market-making activity. Thus, only common stock trades directly related to the market-making activity in the convertible securities would be found exempt from § 16(b). Nor would application of the exemption immunize broker-dealers from liability for actual misuse of inside information, since such misuse would expose them to civil liability under antifraud provisions of the securities laws, *see, e.g.*, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.-10b–5, to disciplinary sanctions by the Commission, *see, e.g.*, 15 U.S.C. § 78*o*(b)(4), and to criminal prosecution, *see, e.g., id.* § 78ff. We agree with the Commission that "[r]eliance on the antifraud provisions, as opposed to the more specific prophylactic protections of Section 16(b), is appropriate in this situation in light of the valuable role of the market-making function and because trading in the ordinary course of market making is generally not intended to take advantage of inside information." (SEC brief on appeal at 10.)

■ In sum, we uphold the district court's ruling that the common stock trading by a broker-dealer, if incident to the firm's market-making activity in the same issuer's debentures that are convertible into the common stock, is exempted by § 16(d) from the short-swing profits provisions of § 16(b).

## B. *Appropriateness of Summary Judgment*

CRA contends that even if the § 16(d) exemption is available in theory, summary judgment should not have been granted in the present case because there existed genuine issues of material fact as to whether Drexel was a market maker in TSI debentures. In support of this contention CRA places principal reliance on the fact that, although in an early affidavit Drexel stated that it listed itself as a market maker in the Yellow Sheets, CRA presented affidavits showing that Drexel did not always list itself as a market maker in the Yellow Sheets.

We agree with the district court that CRA's showing was insufficient to prevent summary judgment. The CRA affidavits disputed only the regularity of and the inference to be drawn from Drexel's listings in the Yellow Sheets. The uncontested affidavits of Drexel and officials of four other broker-dealers, however, established that a firm can be a market maker without so stating in the Yellow Sheets. Thus, while CRA's affidavits created an issue of fact, that fact was not material.

■ Drexel's employees' affidavits stated that for the entire period in question Drexel had in fact held itself out as willing to buy and sell TSI convertible debentures for its own account on a regular and continuous basis. The affidavits by broker-dealers other than Drexel confirmed this statement and showed that these firms had dealt with and recognized Drexel on this basis. CRA did not attempt to rebut these affidavits by presenting "specific facts

showing that there [was] a genuine issue for trial," as required by Fed.R.Civ.P. 56(e). Rather, it sought to side-step this obligation by simply characterizing the facts asserted as mixed questions of law and fact and stating that they were "disputed." The material aspects of these affidavits were, however, factual, and CRA was obliged to respond with a factual showing of its own in order to call Drexel's presentation into question. It did not, and the court's ruling that CRA had presented no genuine issue of material fact was proper.

■ We also conclude that the undisputed facts showing the temporal relationship between trading in the common shares and trading in the convertible debentures demonstrated the absence of a genuine issue of material fact as to the requirement that trading in the former was "incident to" market making in the latter.

## CONCLUSION

The judgment of the district court dismissing the complaint is affirmed.