Leon S. SEGEN, derivatively on behalf of KFx INC., Plaintiff,

v.

WESTCLIFF CAPITAL MANAGEMENT, LLC, et al., Defendants.

No. 03 Civ.1551(WHP).

United States District Court, S.D. New York.

Jan. 20, 2004.

Inc. ("KFx"), seeks disgorgement of $9 million in alleged short-swing profits realized by two groups of insiders pursuant to Rule 16b–6(c)(2) of the Securities Exchange Act of 1934 (the "Exchange Act"), 17 C.F.R. § 240.16b–6. Currently before this Court are defendants' motions for summary judgment on the grounds that they have settled with KFx for the maximum possible recovery under Rule 16b–6(c)(2). Defendants assert that the settlements vitiate an essential element of plaintiff's claim, i.e., damages, and establish an absolute affirmative defense. For the reasons set forth below, defendants' motions are granted.

Glenn F. Ostrager, Ostrager Chong & Flahrety, LLP, New York City, for Plaintiff.

Steven R. Popofsky, Gersten, Savage, Kaplowitz, Wolf & Marcus, LLP, New York City, for Westcliff Defendants.

Anthony L. Paccione, Katten Muchin Zavis Rosenman, New York City, for Ritchie Defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

In this shareholder derivative action, plaintiff Leon S. Segen, on behalf of KFx

### BACKGROUND

This action arises from a series of private placements of KFx securities, beginning on March 28, 2002, through which two distinct groups of defendants, the "Westcliff Defendants"[1] and the "Ritchie Defendants,"[2] ended up owning more than ten percent of the outstanding shares of KFx. As a result, defendants were subject to various "insider"[3] restrictions under Section 16 of the Exchange Act, 15 U.S.C. § 78p, including the "short-swing" profit prohibition in Section 16(b). A brief summary of the relevant transactions follows.

[1]. The "Westcliff Defendants" are Westcliff Capital Management, LLC, Westcliff Public Ventures—KFx, L.P., Westcliff Aggressive Growth, L.P., Westcliff Partners, L.P., Westcliff Long/Short, L.P., Westcliff Small Cap Fund, L.P., Westcliff Master Fund, L.P., Westcliff Energy Partners, L.P., Westcliff Public Ventures, L.P., Westcliff Foundation, and Westcliff Profit Sharing and Money Purchase Pension Plan. In addition, for the purposes of this Memorandum and Order, the term Westcliff Defendants also encompasses transactions by certain clients of the above-named Westcliff Defendants. (Declaration of Richard S. Spencer III, dated June 30, 2003 ("Spencer Decl.") ¶ 2.)

[2]. The "Ritchie Defendants" are RAM Trading Ltd., Ritchie Capital Management, L.L.C., RAM Capital, L.L.C., RAM Capital Investments, Ltd., THR, Inc., and A.R. Thane Ritchie. (Affidavit of Julie Pechersky, dated July 1, 2003 ("Pechersky Aff.") ¶ 1.)

[3]. The term "insider" is used to refer to a person or entity "who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered ..., or who is a director or an officer of the issuer of such security...." 15 U.S.C. § 78p(a)(1).

## I. *The Westcliff Transactions*

Beginning on March 28, 2002, various constituent members of the Westcliff Defendants entered into five private placement transactions with KFx, and also purchased KFx common stock on the open market (collectively, the "Westcliff Transactions"). Prior to that date, the Westcliff Defendants owned approximately 0.36% of KFx's outstanding stock. (Spencer Decl. ¶ 3, Ex. B.)

On March 28, 2002, members of the Westcliff Defendants acquired certain securities from KFx, including common stock, warrants and put options, as well as options to purchase additional common stock and warrants. (Spencer Decl. ¶¶ 5–6, Exs. B–E.) In addition, KFx received a call option to repurchase the shares of common stock sold to the Westcliff Defendants in the transaction. (Spencer Decl. ¶¶ 5–6, Exs. B–E.) [4]

On April 30, 2002, members of the Westcliff Defendants exercised their March 28 common stock and warrant options to acquire additional common stock and warrants from KFx, and were granted additional put options, as well as options to purchase common stock and warrants. (Spencer Decl. ¶¶ 7–8, Exs. F–I.) In addition, the call option granted to KFx on March 28 expired and terminated pursuant to its terms. (Spencer Decl. ¶ 7, Ex. C.) The price of KFx common stock at the time of the April 30 transaction was $2.45 per share. (Declaration of Jahan P. Raissi, dated June 30, 2003 ("Raissi Decl.") ¶ 3, Ex. A.)

On July 1, 2002, members of the Westcliff Defendants exercised some of the common stock and warrant options they were granted on April 30 in order to acquire additional common stock and warrants from KFx, and were granted additional put options. (Spencer Decl. ¶¶ 9–10, Exs. J–M.) The price of KFx common stock at the time of the July 1 transaction was $2.50 per share. (Raissi Decl. ¶ 4, Ex. A.)

On July 19, 2002, members of the Westcliff Defendants again acquired common stock, warrants and put options from KFx, as well as options to purchase additional common stock and warrants. (Spencer Decl. ¶¶ 11–12, Exs. N–R.) The price of KFx common stock at the time of the July 19 transaction was $2.45 per share. (Raissi Decl. ¶ 5, Ex. A.)

On August 21, 2002, two Westcliff Defendants exercised their July 19 options to acquire common stock, warrants, and additional put options from KFx. (Spencer Decl. ¶¶ 13–14, Exs. S–V.) The price of KFx common stock at the time of the August 21 transaction was $2.35 per share. (Raissi Decl. ¶ 6, Ex. A.)

On November 6, 2002, and again on November 12, 2002, certain Westcliff Defendants purchased KFx common stock in the open market at between $1.95 and $2.24 per share. (Spencer Decl. ¶¶ 15–18.)

As of the date of their motion, none of the Westcliff Defendants had purchased any additional KFx securities, sold any KFx stock, or exercised any put options. (Spencer Decl. ¶ 19.) Indeed, the Westcliff Defendants' put options were cancelled on December 19, 2002, for no value. (Spencer Decl. ¶ 19, Ex. W.)

## II. *The Ritchie Transactions*

Contemporaneous with the Westcliff Transactions, various constituent members

---

4. "A put is an option to sell at a certain price within a certain period, and a call is a similar option to buy. The economic *raison d'être* of these options is to serve as a hedge (a form of insurance) against future market movements." 2 Louis Loss & Joel Seligman, *Securities Regulation* 1137 (3d ed.2003).

of the the Ritchie Defendants entered into four private placement transactions with KFx (collectively, the "Ritchie Transactions"). Prior to March 28, 2002, the Ritchie Defendants held no KFx stock. (Affidavit of Mark Morris, dated June 30, 2003 ("Morris Aff.") ¶ 2.)

On March 28, 2002, members of the Ritchie Defendants acquired from KFx certain securities, including common stock, warrants and put options, as well as options to purchase additional common stock and warrants. (Morris Aff. ¶¶ 3–5; Spencer Decl. Exs. B–E.)

On April 30, 2002, members of the Ritchie Defendants acquired from KFx additional shares of common stock, warrants, and put options, as well as options to purchase more common stock and warrants. (Morris Aff. ¶¶ 6–8; Spencer Decl. Exs. F–I.) The price of KFx common stock at the time of the April 30 transaction was $2.45 per share. (Pechersky Aff. Ex. E.)

On July 1, 2002, members of the Ritchie Defendants acquired from KFx additional common stock, warrants and put options. (Morris Aff. ¶¶ 9–11; Spencer Decl. Exs. J–M.) The price of KFx common stock at the time of the July 1 transaction was $2.50 per share. (Pechersky Aff. Ex. E.)

On July 19, 2002, members of the Ritchie Defendants acquired common stock, warrants, and put options from KFx, as well as options to purchase additional common stock and warrants. (Morris Aff. ¶¶ 12–14; Spencer Decl. Exs. N–R.) The price of KFx common stock at the time of the July 19 transaction was $2.45 per share. (Pechersky Aff. Ex. E.)

Between November 6, 2002 and February 27, 2003, members of the Ritchie Defendants purchased KFx common stock in the open market at between $1.95 and $2.68 per share. (Morris Aff. ¶ 16, Ex. A.)

As of the date of their motion, the Ritchie Defendants had not purchased or sold any additional securities of KFx other than as described above. (Morris Aff. ¶ 17.) Like the Westcliff Defendants', the Ritchie Defendants' put options were cancelled on December 19, 2002, for no value. (Morris Decl. ¶ 15; Spencer Decl. Ex. W.)

### III. *Defendants' Short–Swing Profits*

Defendants concede for the purposes of these motions that, although they sold no KFx stock and exercised no put options during the relevant time period, they in fact reaped a small amount of short-swing profits [5] "through a mechanical application of Section 16(b) and the legal fiction of 'deemed' sales...." (Westcliff Mem. at 1.) Consequently, defendants entered into settlement negotiations with KFx, and agreed to disgorge what defendants and KFx jointly determined to be the company's maximum possible recovery under Rule 16b–6(c)(2), $184,905.26. Specifically, the Westcliff Defendants entered into a settlement agreement with KFx to disgorge $123,640 in short-swing profits (Spencer Decl. ¶ 20, Ex. X), while the Ritchie Defendants entered into a settlement agreement with KFx to disgorge $61,265.26 in short-swing profits (Morris Aff. ¶ 18, Ex. B).

Plaintiff, however, disagrees with defendants' methodology for calculating their short-swing profits, arguing that defendants' profits from the transactions at issue total over $9 million based on the actual value of the various derivative instruments. Plaintiff sent demand letters to KFx challenging the adequacy of the

---

**5.** Short-swing profits are "any profits earned [by an insider of an issuer] from a purchase and sale of the securities of that issuer if the purchase and sale are separated by less than six months." *Morales v. Freund,* 163 F.3d 763, 764 (2d Cir.1999)

settlement, but the company declined to prosecute the action on the grounds that it "entered into settlement agreements with [the defendants] pursuant to which they have agreed to pay KFx the *maximum amount* disgorgeable under Section 16(b)." (KFx Mem. at 2 (emphasis in original).) Plaintiff then filed this action.

## DISCUSSION

### I. Summary Judgment Standard

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant may meet this burden by demonstrating a lack of evidence to support the nonmovant's case on a material issue on which the nonmovant has the burden of proof. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Summary judgment is also appropriate in the absence of material facts disputing a defendant's entitlement to judgment as a matter of law on an affirmative defense. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 609 (2d Cir.1996).

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Matsushita Elec.,* 475 U.S. at 587, 106 S.Ct. 1348. In evaluating the record to determine whether there is a genuine issue as to any material fact, the "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505.

### II. Calculation Of Short–Swing Profits Under Section 16

Section 16 was enacted in order to prevent corporate insiders from using confidential information acquired through their positions to "speculat[e] in the stock of the corporations to which they owe a fiduciary duty." Senate Comm. on Banking & Currency, Stock Exchange Practices, S.Rep. No. 1455, 73d Cong., 2d Sess. at 68 (1934); *accord Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir.1998) (Section 16 is designed "to deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade.") (footnote omitted). Congress codified this prohibition in Section 16(b), which requires statutory insiders to disgorge to the issuer any short-swing profits, which are determined by "matching" an insider's purchases and sales during the six-month period.

Rather than require a fact-finder to determine whether confidential information was actually used in any one case, Congress crafted Section 16(b) as a "crude rule-of-thumb" that establishes a bright line rule against such trading. Senate Comm. on Banking & Currency, Stock Ex-

change Practices, S.Rep. No. 1455, 73d Cong., 2d Sess. 6557 (1934); *accord Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320–21 (2d Cir.1998) (Section 16(b) "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition."); *Cummings v. Comm'r*, 506 F.2d 449, 452 (2d Cir.1974) (describing Section 16 as "a placid inlet in the chaotic sea of securities law—a statute designed for easy application"); *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 280 F.Supp.2d 128, 133–34 (S.D.N.Y.2003) ("as designed, Section 16(b) is not open to much interpretation or debate; it imposes a brand of strict liability"), *reconsideration granted in part by* No. 99 Civ. 2821(VM), 2003 WL 22480052 (S.D.N.Y. Oct. 31, 2003).

A. *Rule 16b–6*

In 1991, the Securities and Exchange Commission (the "SEC" or the "Commission") amended its rules under Section 16(b) in order to clarify the statute's application to derivative securities.[6] *See* SEC Release No. 34–28869, 56 Fed.Reg. 7242, 7242–43 (Feb. 8, 1991). According to the Commission, "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16, since the value of the derivative securities is a function of or related to the value of the underlying equity security." SEC Release No. 34–28869, 56 Fed. Reg. at 7248.

As part of the 1991 amendments, the SEC promulgated Rule 16b–6, which governs the calculation of short-swing profits where a derivative security is matched against purchases or sales of other deriva-

tive securities. Under Rule 16b–6, the receipt of a fixed-price derivative, such as a put option, is deemed to be a sale of the underlying common stock upon receipt of the option, regardless of whether the option is ever exercised. 17 C.F.R. § 240.16b–6(a). The same is true of warrants and call or purchase options, which are deemed to be purchases of the underlying security upon receipt. 17 C.F.R. § 240.16b–6(a). The Commission considers the receipt of the option as the operative date because "[j]ust as an insider's opportunity to profit commences when he purchases or sells the issuer's common stock, so too the opportunity to profit commences when the insider engages in transactions in options or other derivative securities that provide an opportunity to obtain or dispose of the stock at a fixed price." SEC Release No. 34–28869, 56 Fed.Reg. at 7248. This policy "treats the exercise of a fixed-price option as nothing more than a change from an indirect form of beneficial ownership of the underlying securities to a more direct one; because the insider by then is already bound by the terms of the option, the potential for abuse of inside information is minimal." *Magma Power*, 136 F.3d at 322.

The calculation of short-swing profits in this action is governed by Rule 16b–6(c)(2), which covers the calculation of short-swing profits where a derivative security is matched against purchases or sales a different type of derivative security or common stock. The rule states in relevant part:

(c) In determining the short-swing profit recoverable pursuant to section 16(b) of the Act from transactions involving the purchase and sale or sale and pur-

**6.** As defined in Section 16, derivative securities include "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security or similar securities with a value derived from the value of an equity security...." 17 C.F.R. § 240.16a–1(c).

chase of derivative and other securities, the following rules apply:

\*     \*     \*     \*     \*     \*

(2) Short-swing profits in transactions involving the purchase and sale or sale and purchase of derivative securities having different characteristics but related to the same underlying security (e.g., the purchase of a call option and the sale of a convertible debenture) or derivative securities and underlying securities shall not exceed the difference in price of the underlying security on the date of purchase or sale and the date of sale or purchase. Such profits may be measured by calculating the short-swing profits that would have been realized had the subject transactions involved purchases and sales solely of the derivative security that was purchased or solely of the derivative security that was sold, valued as of the time of the matching purchase or sale, and calculated for the lesser of the number of underlying securities actually purchased or sold.

17 C.F.R. § 240.16b–6(c)(2).

■■■■ Because both the Westcliff Defendants and Ritchie Defendants received, at various times, put options, warrants, and purchase options, the calculation of short-swing profits in this case requires that the put options, which are deemed sales, be matched with purchases of KFx common stock or the receipt of warrants or purchase options, which are deemed purchases. Defendants argue that once the transactions are properly matched, the

maximum short swing profit available to KFx by the plain language of Rule 16b–6(c)(2) is the difference in market price of KFx common stock at the time defendants received the option and at the time of a properly-matched transaction within a six-month period. Plaintiff, however, argues that the proper measure of defendants' short-swing profits is the difference between the market price of KFx common stock on the date of deemed purchase or sale and the "actual price" paid by defendants for the derivative security itself, a price to be determined by experts employing complex options-pricing methodologies such as the Black–Scholes model.[7] (Pl. Opp. at 14–20; Amended Complaint ¶¶ 51, 61, 72, 81.) Plaintiff's novel position, however, is undermined by the plain language of Rule 16b–6(c)(2), the SEC's own releases concerning the calculation of short-swing profits for matched derivative transactions, the policy behind Section 16, the opinions of leading commentators, the relevant caselaw in this Circuit, and the doctrine of *expressio unius est exclusio alterius.*

First, plaintiff's argument that the "actual price" paid for the derivative security should be used instead of the market price of the underlying common stock is contradicted by the plain language of the rule itself, which directs that short-swing profits "shall not exceed the difference in *price of the underlying security* on the date of purchase or sale and the date of sale or purchase." 17 C.F.R. § 240.16b–6(c)(2) (emphasis added). Indeed, the Commission refers to public market price in illus-

---

7. *See Mathias v. Jacobs,* 238 F.Supp.2d 556, 574 n. 12 (S.D.N.Y.2002) ("The [Black–Scholes] model was developed in 1971 by economists Fisher Black and Myron Scholes, for which they were awarded the Nobel Prize in 1997. The essential factors the formula takes into account driving the value of an option to purchase common stock are: (1) the

stock price on the date of valuation; (2) the exercise price at which the option holder can purchase the stock; (3) the amount of time over which the option will be valid and outstanding; (4) the volatility of the underlying common stock; and (5) the risk-free rate of interest rates at the time the option is being valued.").

trating how the profit cap under Rule 16b–6(c)(2) operates:

> For example, on April 1st an insider purchases a warrant for $2 with an exercise price of $10 a share and a *market price of the underlying securi- ty* of $9 per share. On May 1st, the insider sells an option for $2 with an exercise price of $15 a share while the underlying security was $15 per share. The warrant purchased on April 1st was selling for $9 on May 1st. Thus, the profit would appear to be $7 per share. However, the maximum recovery would be $6 per share (*representing the change in the underlying stock*).

SEC Release No. 34–27148, 54 Fed.Reg. 35667, n. 105 (Aug. 29, 1989) (emphases added); *see also* SEC Release No. 34–28869, 56 Fed.Reg. at 7254 ("the maximum short-swing profit recovery is the difference in *market value of the underlying security* between the date of purchase and the date of sale") (emphasis added) (footnotes omitted).

Second, plaintiff's policy argument—that to accept defendants' "market price" construction is to "ignore economic reality" (Pl. Opp. at 1)—is contrary to the explicit policy rationale espoused by the Commission in adopting Rule 16b–6(c)(2). The SEC's decision to cap recoverable short-swing profits and tie them to the market price of the underlying security was predicated on a strong desire to avoid the "battle of the experts" in every case. In its proposing release for Rule 16b–6, the SEC acknowledged the compromise:

> Substantial progress has been made in the valuation of options and derivative instruments, and techniques such as the Black–Scholes option valuation formula and its progeny are now widely used by traders in the marketplace.... The Commission recog-

nizes, however, that *the interests of precision must be balanced against the costs of computation. The interests of justice and Congress' purpose in adopting Section 16(b) will not be served by turning every case involving derivative instruments into a battle of experts over competing models of option valuation.* Accordingly, the Commission seeks to provide certain benchmarks or rules of thumb to be applied in short-swing transactions involving derivative securities.

SEC Release No. 34–26333, 53 Fed.Reg. 49997, 5009 (Dec. 13, 1988) (emphasis added) (footnotes omitted). Plaintiff's proposed methodology of profit calculation would require just such a "battle of the experts" in every case.

Third, leading commentators uniformly sanction public market price as the proper benchmark for calculating short-swing profits for matched derivative transactions under Rule 16b–6(c)(2). *See, e.g.,* Romeo & Dye, *Comprehensive Section 16 Outline* 280 (April 2003) ("Release No. 34–28869, § III.E.3. (1991) makes clear that the market price of the underlying security is to be used to determine the difference on the purchase and sale dates."); Jacobs, *Section 16 of the Exchange Act* (2002) § 3:31 (to calculate profits under 16b–6(c)(2) "[a] court should try to determine the trading price of the underlying security at the moment the derivative security was purchased or sold.").

Fourth, while there is an absence of controlling authority on the issue, the sole district court decision to interpret Rule 16b–6(c)(2) endorses market price as the proper measure, albeit in dicta. *See Levy v. Gen. Elec. Capital Corp.,* No. 99 Civ. 10560(AKH), 2002 WL 1225542, at *2 (S.D.N.Y. June 4, 2002) (noting that short-swing profits under Rule 16b–6(c)(2) are to be determined by reference to the price of

the underlying security and "not of the actual securities involved in the purchase and sale"). While plaintiff correctly notes that *Levy's* discussion of Rule 16b–6(c)(2) was mere dicta, he provides no compelling rationale for disagreeing with the conclusion.

Finally, assigning the meaning "actual price of the derivative security" to the phrase the "price of the underlying security" in Rule 16b–6(c)(2), as urged by plaintiff, is precluded by the doctrine of *expressio unius est exclusio alterius*.[8] Unlike Rule 16b–6(c)(2), which governs transactions where different derivative securities are matched, the Commission used the phrase "actual price" to address transactions where identical derivative securities are matched in Rule 16b–6(c)(1). *Compare* 17 C.F.R. § 240.16b–6(c)(1) ("Short-swing profits in transactions involving the purchase and sale or sale and purchase of derivative securities that have identical characteristics ... shall be measured by the *actual prices paid or received* in the short-swing transactions.") (emphasis added) *with* 17 C.F.R. § 240.16b–6(c)(2) ("Short-swing profits in transactions involving the purchase and sale or sale and purchase of derivative securities having different characteristics but related to the same underlying security ... or derivative securities and underlying securities *shall not exceed the difference in price of the underlying security* on the date of purchase or sale and the date of sale or purchase.") (emphasis added).[9] Since the SEC clearly knew how to use the term "actual price" when it intended to, the phrase's absence from Rule 16b–6(c)(2) prohibits assigning the meaning argued by plaintiff. *See Barnhart v. Peabody Coal*

*Co.*, 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) ("The canon [of *expressio unius est exclusio alterius*] depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded.") (first alteration added).

## B. Calculation Of KFx's Maximum Possible Recovery

It is beyond cavil that the use of the market price of the underlying security to determine short-swing profits for matched derivative transactions is the proper method. Therefore, the only question left for this Court to resolve is whether the amount of the proposed settlement is indeed the maximum possible disgorgement in this action.

To determine KFx's maximum possible recovery in a suit under Rule 16(b)–6(c)(2), it is first necessary to define the universe of transactions subject to Section 16's insider prohibitions. There is no statutory prohibition on transactions prior to meeting the ten percent insider's threshold. 15 U.S.C. § 78p(b). Further, the transaction that puts an insider over the ten percent threshold is not subject to Section 16(b) matching. *Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 254, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *Schaffer*, 280 F.Supp.2d at 132. Thus, "only purchases made after the entity has attained the 10 percent threshold can be matched with sales within six months and be subject to disgorgement." *Levy v. Oz Master Fund, Ltd.*, No. 00 Civ.

---

8. "[T]he mention of one thing implies the exclusion of the other." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 794 (2d Cir.1999).

9. It is undisputed that the matched derivative securities at issue in this case do not have identical characteristics, and therefore Rule 16b–6(c)(2) and not Rule 16b–6(c)(1) applies.

7148(AGS), 2001 WL 767013, at *11 (S.D.N.Y. July 9, 2001). In this action, therefore, the first transactions that could properly be matched took place after March 28, 2002, the date both groups of defendants exceeded the ten percent insider threshold. (Westcliff Def. Mem. at 16–17; Raissi Decl. ¶ 7, Ex. B.; Spencer Decl. ¶¶ 3–6; Ritchie Def. Mem. at 2–4; Morris Aff. ¶¶ 2–5.)

Second, a date and time must be established for each deemed purchase or sale in order to determine the price of the underlying security. Beginning with the 1991 amendments to Section 16, the purchase or sale of an option or other derivative instrument is deemed to have occurred on the date the option is received, rather than the date it is exercised, which was the rule prior to the amendments. 17 C.F.R. § 240.16b–6(a); *accord Frankel v. Slotkin,* 984 F.2d 1328, 1338 (2d Cir.1993); *see also Donoghue v. Westwood One, Inc.,* No. 01 Civ.9325 (LMM), 2003 WL 57928, *1 (S.D.N.Y. Jan. 7, 2003) ("The Court cited these cases for the proposition that an option is a purchase only when it is exercised, not when it is granted. However, the S.E.C. and the Second Circuit have since adopted a contrary position."). The Commission was explicit in its repudiation of its prior position:

> In realigning the section 16(b) focus from the exercise of the derivative securities to the acquisition of the derivative securities, the new regulatory framework not only reverses the Commission's own regulatory approach but also differs from a line of cases that, in the absence of rules to the contrary, have held that the exercise of the option (rather than its acquisition) is the section 16(b) purchase of an equity security.

SEC Release No. 34–28869, 56 Fed.Reg. at 7250. Therefore, the price of the underlying security to be used for each post-March 28 transaction is the price of KFx common stock at the date and time when the transaction at issue occurred. (Raissi Decl. ¶¶ 4–6, Ex. A; Pechersky Aff. Ex. E.)

Third, each individual member of the Westcliff Defendants and Ritchie Defendants, even though considered a member of their respective "groups" for the purposes of aggregation to determine ownership percentage vis-a-vis the ten percent insider threshold, is only liable for its own short-swing profits resulting from its own trades. *See* SEC Release No. 34–28869, 56 Fed.Reg. at 7245 ("[O]nly those securities in which a member of a group has a direct or indirect pecuniary interest would be ... subject to short-swing profit recovery. Thus, while securities holdings of group members may subject the group members to section 16, if the group member does not have or share a pecuniary interest in securities held by other group members, the transactions of the other group members do not create section 16 obligations for that member.") (footnotes omitted).

Finally, the trades must be matched in a manner that maximizes the disgorgeable amount to KFx. This is accomplished by matching the highest sale prices with the lowest purchase prices within the six month period. *See Smolowe v. Delendo Corp.,* 136 F.2d 231, 239 (2d Cir.1943) ("The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out—within six months....").

■ Applying this methodology to the Westcliff Transactions yields maximum short-swing profits of $123,640 for the Westcliff Defendants, and applying it to the Ritchie Transactions yields maximum short-swing profits of $61,265.26 for the Ritchie Defendants. (Westcliff Def. Mem.

at 16–17; Raissi Decl. ¶ 7, Ex. B.; Spencer Decl. ¶¶ 5–18; Ritchie Def. Mem. at 2–4; Morris Aff. ¶¶ 6–17.) *See also* 17 C.F.R. § 240.16b–6(c)(2) ("Short-swing profits . . . *shall not exceed*") (emphasis added). Therefore, the maximum possible disgorgement equals $184,905.26, the amount of the defendants' settlements with KFx. (Spencer Decl. ¶ 20, Ex. X; Morris Aff. ¶ 18, Ex. B.) No material question of fact exists with respect to these calculations.

Since defendants have already entered into a binding settlement agreement[10] with KFx to disgorge the maximum possible short-swing profits under Rule 16b–6(c)(2), plaintiff is unable to prove an essential element of his claim under Section 16(b)—namely, short-swing profits that must be disgorged. *See Abbe v. Goss,* 411 F.Supp. 923, 924–26 (S.D.N.Y.1975) (summary judgment granted for Section 16(b) defendants where defendants had already repaid the maximum disgorgeable amount); *cf. Nat'l Westminster Bancorp NJ v. Leone,* 702 F.Supp. 1132, 1135–37 (D.N.J.1988) (denying summary judgment where issue of fact remained as to whether maximum disgorgeable amount had previously been paid to SEC). Therefore, summary judgment is appropriate.[11] *Abbe,* 411 F.Supp. at 926.

### III. *Plaintiff's Need for Discovery*

■ Plaintiff's final gambit to avoid summary judgment on his claim is a Rule 56(f) affidavit arguing for further discovery in order to oppose defendants' motions for summary judgment. Specifically, plaintiff claims that he is unable to admit or deny defendants' profit calculation, even using defendants' market price methodology, without discovery "to determine whether defendants have identified all relevant transactions in KFx equities for computation of short-swing profits," and whether any options granted to defendants were exercised. (Pl. Opp. Mem. at 22; Affidavit of Glenn F. Ostrager Pursuant to Fed. R.Civ.P. 56(f), dated July 21, 2003 ("Ostrager Aff.") ¶¶ 9–10.)

First, plaintiff's request for discovery concerning the date of any option exercises is a red herring, because, as noted earlier, the purchase or sale of an option or other derivative instrument is deemed to have occurred on the date the option is received, rather than the date it is exercised. *See supra* Section II.A.; *see also Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit . . . will properly preclude summary judgment."). Second,

---

**10.** Defense counsel made the following representation at oral argument when questioned about the settlement argument:

> The contract is entered into. It is stipulated in the contract that upon approval or summary judgment . . . that it will be paid. We have agreed with KFx, and are happy to put it on the record, that should the Court grant this motion, that there is absolutely a binding obligation to pay that entire amount. . . . [I]n this situation we have a binding obligation enforceable completely to make payment to KFx for the full amount.

(Transcript of Oral Argument, dated September 16, 2003, at 3–4.)

**11.** Alternatively, defendants' disgorgement of the maximum short-swing profits recoverable under Rule 16b–6(c)(2) serves as a complete affirmative defense to further liability under Section 16(b) arising from the same transactions. *See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 734 F.Supp. 1071, 1076–78 (S.D.N.Y.1990) (granting partial summary judgment and holding that plaintiff may not recover profits already disgorged under Rule 10(b), basing decision on Section 16(b) cases); Jacobs, *Section 16 of the Securities Exchange Act* § 3:86 ("Paying the profit to the issuer—is a defense."); *see also BellSouth Telecomms.,* 77 F.3d at 609 (summary judgment "principles apply whether summary judgment is granted on the merits of the claim, or on an affirmative defense").

plaintiff offers only rank speculation that defendants may not have disclosed the extent of their transactions in KFx securities. Plaintiff also overlooks the fact that he pled the transactions at issue in his complaint. Plaintiff's speculation, especially when contradicted by affidavits or public trading records as in this case, is insufficient to defeat a motion for summary judgment. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994) (holding that a Rule 56(f) request is properly rejected where it is "based on speculation as to what potentially could be discovered"); *Gray v. Town of Darien,* 927 F.2d 69, 74 (2d Cir.1991) ("In a summary judgment context, an 'opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion.'") (quoting *Contemporary Mission, Inc. v. United States Postal Serv.,* 648 F.2d 97, 107 (2d Cir.1981)).

Finally, plaintiff argues, without indication of how it is relevant, that "the manner in which these settlements [between defendants and KFx] were arrived at is highly suspicious." (Pl. Opp. Mem. at 11.) Putting aside KFx's declaration that the settlements were negotiated at arm's-length and in good faith (Declaration of Leif King, dated Aug. 5, 2003 ¶¶ 5–13), plaintiff makes no connection between any alleged nefarious dealings and the proper calculation of short-swing profits from matched derivative transactions. *See Magma Power,* 136 F.3d at 320–21 ("Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition. 'Such is the price of easy administration.'") (quotation omitted); *see also Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit ... will properly preclude summary judgment.").

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted, and plaintiff's complaint is dismissed with prejudice. The Clerk of Court is directed to mark this case closed.

SO ORDERED.